IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CONSTRUCTION FINANCIAL ADMINISTRATION SERVICES LLC D/B/A CFAS** <br> 113 Iron Furnace Court <br> Lewisberry, PA 17339 <br> Plaintiff, <br> v. <br><br> **FEDERAL INSURANCE COMPANY** <br> 251 North Illinois Street, Suite 1100 <br> Indianapolis, IN 46204 <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | CIVIL ACTION NO.: <br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff, Construction Financial Administration Services, LLC d/b/a CFAS ("**CFAS**"), by and through its undersigned counsel, hereby asserts the following Complaint against Defendant and in support thereof states the following:

### I. THE PARTIES

1. Plaintiff CFAS is a limited liability company duly organized and existing under the laws of the Commonwealth of Pennsylvania with a business address at 113 Iron Furnace Court, Lewisberry, PA 17339, with all members citizens of States other than Indiana. At all relevant times, CFAS's principal office was located in Southport, North Carolina and the occurrences relevant to this action took place there.

2. Defendant Federal Insurance Company ("**Federal Insurance**") is a property and casualty insurer and surety organized as a corporation under the laws of the State of Indiana, with a registered principal place of business address of 251 North Illinois Street, Suite 1100, Indianapolis, IN 46204.

3.  Federal Insurance is a member company d/b/a as part of the Chubb Group of Insurance Companies. Claims submitted under Chubb insurance policies issued by Federal Insurance are administered by Claims Department, The Chubb Croup of Insurance Companies, 82 Hopmeadow Street, Simsbury, Connecticut, 06070-7683.

## II.   JURISDICTION AND VENUE

4.  This Court has original jurisdiction pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.  Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391 as Federal Insurance d/b/a Chubb Group of Insurance Companies, conducts, transacts, and solicits business in this District.

## III.   FACTUAL BACKGROUND

### A. CFAS - An Independent Third-Party Construction Project Funds Administrator.

6.  CFAS is in the business of independent third-party construction funds administration. CFAS administers construction project funds for small and emerging contractors awarded construction contracts by government agencies where sureties issuing performance and payment bonds for the projects require independent third-party project fund administration to mitigate the payment risk under the bonds. CFAS services include the deposit and disbursement of project funds paid by government agencies on construction projects involving CFAS's contractor clients to entities providing labor and material to CFAS's contractor clients on that specific project.

### B. CFAS's Insurance Coverage Provided by Federal Insurance.

7.  In or about August 2017, in consideration of the payment of a premium, Federal Insurance issued to CFAS at its office in North Carolina the Chubb Professional Errors and

2

Omissions Policy No.8243-6189 (the **"Policy"**) to CFAS for the policy period August 21, 2017 to August 21, 2018.

8. The Policy has a limit of liability of $2,000,000.00 per claim and $2,000,000.00 in the aggregate for claims arising from Wrongful Acts which occurred after January 1, 2017.

9. The CFAS Policy, in its pertinent parts, states that:

"[Federated Insurance Company] shall pay **Loss** on behalf of the **Insureds** resulting from any **Claim** first made against such **Insureds** ............. for **Wrongful Acts** committed by the **Insureds** solely in the performance of or failure to perform **Insured Services** the acts. See Policy, I. INSURING CLAUSE, p. 3 of 14)

**Claim** means a written demand for monetary damages or non-monetary relief. See Policy, II. DEFINITIONS, (B)(1)(a), p. 3 of 14

**Insured(s)** means the Insured Organization and any Insured Person. See Policy, II. DEFINITIONS, (G), p. 4 of 14

**Insured Person(s)** means any past, present or future natural person director, officer, partner, or **Employee** of the **Insured Organization,** but only while such person was, is or shall be acting within the scope of his or her duties as such. See Policy, II. DEFINITIONS, (I), p. 4 of 14)

**Insured Services** means only services that (i) are performed for others for a fee and (ii) are identified in Item 6 of the Declarations, including any such services that are performed electronically utilizing the Internet or a network of two or more computers. See Policy, II. DEFINITIONS, (J), p. 4 of 14)

**Loss** means the total amount which any **Insured** becomes legally obligated to pay as a result of any **Claim** made against such **Insured,** including:
(1) damages, including punitive or exemplary damages, to the extent such damages are insurable under the law most favorable to the insurability of such damages of any jurisdiction which has a substantial relationship to the **Insureds,** the Company, this Policy or the Claim;
(2) judgments and settlements;
(3) pre-judgment and post-judgment interest; and
(4) Defense Costs.
See Policy, II. DEFINITIONS, (L), p. 4-4 of 14

10. The Policy, as amended by Endorsement/Rider 3, provides that Federal Insurance:

> shall pay on behalf of the Insured, Loss on account of a Claim first made against the Insured during the Policy Period, or the Extended

3

Reporting Period if applicable, for a Wrongful Act on or after the Prior Acts Date as set forth in Item 7 of the Declarations, by the Insureds or by any entity or natural person for whose Wrongful Acts the Insured is legally liable.

11. Endorsement/Rider No. 2 deletes the definition of **"Insured Services"** as defined in Section II, Definitions (J) of the Policy, *supra,* and replaced it with the following definition:

> (J) Insured Services means consulting services performed for others for a fee, including any such consulting services that are performed electronically utilizing the internet or a network of two or more computers provided that such consulting services shall not include accounting, legal, architectural, engineering, actuarial, asset management, investment, financial planning, foreclosure, debt settlement, loan modification or refinance, Medical or Utilization Review services.

12. The Policy defines Wrongful Acts as follows:

> (T) Wrongful Act(s) means any actual or alleged negligent act, error or omission committed, attempted, or allegedly committed or attempted solely in the performance of or failure to perform Insured Services, by an Insured Organization or by an Insured Person acting in his or her capacity as such and on behalf of an Insured Organization.

### C. Standard Internal Operating Procedures Implemented by CFAS to Insure Proper Disbursement of Construction Funds.

13. In order to fulfill CFAS's responsibilities as an independent construction funds administrator and to ensure the timely and proper disbursement of project funds, CFAS has implemented internal operating procedures that its employees were expected to follow in receiving, depositing and disbursing of project funds.

14. CFAS internal operating procedures require CFAS to enter into a Funds Administration and Disbursement Agreement with each of its contactor clients requiring, *inter alia,* for the contractor client to: (a) agree to the establishment of a bank account for deposit of

4

project funds with CFAS as the sole authorized signatory on disbursements ("**Disbursement Account**"); (b) provide CFAS with a complete list of subcontractors and material suppliers to be utilized by contractor client on the construction project to whom CFAS will be required to disburse project funds, including contact information for each subcontractor and supplier, the amount of each of their contracts for labor and materials to be supplied, and W-9 information; (c) provide CFAS with copies of its contracts with the project owner and with each of its subcontractors and suppliers; (d) provide the original bid estimate for the project with breakdowns, an itemized budget of project costs, and all signed purchase orders issued on the project; (e) provide an irrevocable "Letter of Direction or Assignment of Claims" directing the project owner to send to CFAS all payments issued for the project for deposit into and disbursement by CFAS from the Disbursement Account; and (f) provide CFAS a formal disbursement voucher in pre-approved form for any payment request submitted to CFAS for project funds ("**Disbursement Voucher**").

15.   CFAS's internal operating procedures require each Disbursement Voucher to be accompanied with: (a) a copy of the underlying payment application made by the contractor client to the project owner for release of project funds to CFAS for work completed and/or materials supplied on the project, with identification of the line item in the payment application to which the disbursement request applies ("**Marked-Up Payment Application**"); (b) copies of the subcontractor and/or supplier invoices for the work completed and/or supplies delivered; and (c) a Release and Waiver Form, duly executed and notarized by the subcontractor and/or or supplier for such invoices.

16.   CFAS's internal operating procedures also contemplated that CFAS, before authorizing any disbursement from the Disbursement Account, to verify that it had received all the documentation the client was required to provide under the Funds Administration and

Disbursement Agreement including the documents required to be submitted in connection with any payment request.

**D. The Fence Project.**

17. On or about November 9, 2017, SWF Constructors ("**SWFC**") entered into a contract with the US Army Engineer District - Fort Worth ("**Fence Project Owner**") to perform construction work for a project described as D/B Calexico Fence Replacement, 2 Miles Calexico, California - W9126G-D-0010 (the "**Fence Project**").

18. The surety for the labor and performance bonds issued for the Fence Project required SWFC to utilize the services of an independent third-party funds administrator and SWFC retained the services of CFAS.

19. On or about November 14, 2017, pursuant to its internal operating procedures, SWFC and CFAS entered into a Funds Administration and Disbursement Agreement ("**SWFC Funds Administration and Disbursement Agreement**") providing for CFAS to provide independent third-party fund administrator services to SWFC for the Fence Project.

20. Pursuant to CFAS's internal operating procedures and as required by the SWFC Funds Administration and Disbursement Agreement, a SWFC Disbursement Account was established for the Fence Project with an officer of CFAS as the sole authorized signatory for disbursement of funds from the account.

21. Pursuant to CFAS's internal operating procedures and the SWFC Funds Administration and Disbursement Agreement, SWFC provided to CFAS the documentation that it was required to provide under the Funds Administration and Disbursement Agreement including: an itemized budget for the Fence Project, a list identifying the subcontractors and suppliers supplying services and materials for the Fence Project including contact information and W-9

information for each subcontractor and supplier, and copies of SWFC's contract with the Fence Project Owner and each of its subcontractors and suppliers for the Fence Project.

### E. The Custom and Practice Followed by SWFC in Requesting Payments and by CFAS in Processing Disbursements from the SWFC Disbursement Account.

22. With respect to payment requests made prior to the April 9, 2018, SWFC had provided to CFAS: (a) a Disbursement Voucher; (b) a summary of the payments sought on the Disbursement Voucher; (c) copies of any subcontractor or supplier invoices to be paid; (d) copies of the Marked-Up Payment Application, and; (e) a Waiver and Release Form signed and notarized by each subcontractor or supplier to be paid from the SWFC Disbursement Account.

23. With respect to payment requests prior to April 9, 2018, before sending out any payments from the SWFC Disbursement Account, a CFAS employee had verified that all required documentation supporting the payment request had been received, and the CFAS officer responsible for authorizing the disbursement had verified that the documentation supported the payment request.

### F. CFAS's Errors and Omissions in Processing Two Disbursements Requests from the SWFC Disbursement Account.

24. On or about Friday, April 6, 2018, CFAS received a $1,692,441.91 payment from the Fence Project Owner which funds were deposited into the SWFC Disbursement Account for payment of SWFC subcontractors and suppliers.

25. On Monday, April 9, 2018, CFAS received what purported to be a request from SWFC for expedited payment from the SWFC Disbursement Account in the amount of $600,000.00 to HK Canopy Technology Limited ("**HKCTL**") by wire transfer to a bank account under the name of HKCTL at Hang Seng Bank in Hong Kong. An invoice accompanied the request.

7

26. HKCTL was not listed in SWFC's budget for the Fence Project as a SWFC subcontractor or supplier and SWFC had not provided CFAS a copy of any contract between HKCTL and SWFC for the Fence Project.

27. The April 9, 2018 payment request purported to have been made by SWFC did not include the required: (a) Disbursement Voucher; (b) SWFC's Marked-Up Payment Application; or (c) executed Release and Lien Waiver forms.

28. CFAS's employees and/or officers erred in the processing of the payment request failing to follow CFAS's internal operating procedures in that its employees and officers failed to ascertain, review and verify that the suppler was listed in SWFC's budget, that a copy of the subcontract had been received, and that the request included a Disbursement Voucher, SWFC's Marked-Up Payment Application, or an executed Release and Lien Waiver form from the purported supplier. Nonetheless, CFAS made the requested payment.

29. On Tuesday, April 10, 2018, CFAS received what purported to be a second payment request from SWFC for another expedited payment to HKCTL from the SWFC Disbursement Account in the amount of $700,000.00 to be made by wire transfer to the same bank account at Hang Seng Bank in Hong Kong.

30. The SWFC's April 10, 2018 payment request did not include the required: (a) Disbursement Voucher; (b) SWFC's Marked-Up Payment Application; or (c) executed Release and Lien Waiver forms.

31. CFAS's employees and/or officers erred in the processing of the payment request failing to follow CFAS's internal operating procedures in that its employees and officers failed to ascertain, review and verify that the suppler was listed in SWFC's budget, that a copy of the subcontract had been received, and that the request included a Disbursement Voucher, SWFC's

8

Marked-Up Payment Application, or an executed Release and Lien Waiver form from the purported supplier. Nonetheless, CFAS made the requested payment.

### G. CFAS's Discovery that the April 9 and April 10, 2018 Payment Requests Were Fraudulent.

32. On Wednesday, April 11, 2018, SWFC submitted a Disbursement Voucher and related documentation requesting further payments from the SWFC Disbursement Account.

33. Upon receiving the April 11, 2018 payment requests, CFAS informed SWFC that it could not process the payments requested because the payments it made to HKCTL, pursuant to the April 9, 2018 and April 10, 2018 payment requests, had depleted the SWFC Disbursement Account and there were insufficient funds in the account to make any payment in response to the SWFC's April 11, 2018 requested payments.

34. On or about April 11, 2018, SWFC informed CFAS that HKCTL was not a SWFC subcontractor or supplier, that SWFC had not authorized or requested the payments to HKCTL and that HKCTL was not entitled to the funds that it was paid.

### H. SWFC's Notice of Claim and CFAS's Efforts to Stop of Otherwise Mitigate Losses.

35. Upon being advised by SWFC that it had not requested the April 9, 2018 and April 10, 2018 payments, CFAS immediately contacted the banks in the United States involved with the wire transfer, the Hang Seng Bank in Honk Kong and law enforcement in the United States and Hong Kong to try to stop the transfer and/or to recover the payments, and hired legal counsel to assist in the recovery effort.

36. By letter to CFAS dated April 13, 2018, SWFC issued a "Notice of Demand" to CFAS.

37. In its Notice of Demand, SWFC reiterated its position that the two wire transfers totaling $1,300,000.00 that were made from the SWFC Disbursement Account to an account in

Hong Kong were made without any of the documentation required by the SWFC Funds Administration and Disbursement Agreement.

38. SWFC further advised CFAS that:

> [t]he Project for which funds were being held in trust by CFAS requires payment of subcontractors within seven days of receipt of funds. Failure to make timely payment may have serious repercussions on the to perform the [Fence Project] contract.

39. SWFC demanded that CFAS:

1) Immediately remit $1,300,000 to the project account for payment of a subcontractor payment that is due no later than April 13, 2018.
2) Provide a copy of any and all insurance policies that may cover this claim including errors and omissions, crime, cyber liability and or fiduciary bonds.
3) Provide a copy of any and all claims correspondence and claim number with any bank, insurance carrier, government agency regarding the wire transfer and the recovery of funds.

40. CFAS believes and therefore avers that CFAS was under a legal obligation to replenish the Fence Project Funds it had negligently disbursed to HKCTL's account in Hong Kong.

41. In an effort to avoid the substantial damages that it would have incurred if CFAS allowed a default to occur under the Fence Project contract as a result of its failure to timely pay subcontractors and suppliers, and to continue to fulfill its legal obligations and its duties under the SWFC Funds Administration and Disbursement Agreement, and its independent duties as a fiduciary of funds it received in trust for the Fence Project, CFAS borrowed $1,000,000.00 and deposited the funds into the SWFC Disbursement Account for payment of SWFC subcontractor and suppliers.

42. CFAS has reserved its right to recover from any responsible party or any insurer the amounts it added to the SWFC Disbursement Account.

43. On or about April 13, 2018, pursuant to the instructions contained in the authenticated SWFC April 11, 2018 Disbursement Voucher and the SWFC April 13, 2018 Notice of Demand, CFAS disbursed $1,533,693.68 from the SWFC Disbursement Account.

44. Through legal proceedings initiated in Hong Kong, CFAS recovered $127,007.87 of the $1,300,000.00 disbursed to HKCTL and deposited the recovered funds into the SWFC Disbursement Account.

45. CFAS incurred in excess of $60,000.00 in legal expenses in its attempt to recover the negligently disbursed funds.

46. To make up the remaining shortfall, caused by the April 9, 2018 and April 10, 2018 payments to HKCTL, CFAS deferred receipt of the fees due it under the Funds Administration and Disbursement Agreement.

47. But for CFAS's errors, omissions and negligence, by failing to follow its internal operating procedures, the loss of $1.3 million would not have occurred.

**I. CFAS's Submission of a Claim under its Errors and Omissions Insurance Policy**

48. Pursuant to the terms of the Policy, on April 17, 2018, CFAS timely and promptly made a claim under the Policy by sending a Notice of Claim to the Claims Department, Chubb Group of Insurance Companies, 82 Hopmeadow Street, Simsbury, CT 06070-7683 ("**Chubb NOC**") informing Chubb of the losses it suffered as a result of the negligent acts, errors and omissions of its employees and officers.

49. Despite CFAS's claim for benefits under the Policy, Defendant has refused, without legal justification, to pay CFAS's claim.

50. By letter dated June 6, 2018, Defendant, without legal justification, informed CFAS that there was no coverage for the claim submitted by CFAS under the Policy.

51. Solely as a result of Defendant's wrongful denial of coverage and refusal to pay benefits which CFAS purchased and Defendant is required to provide under the Policy, CFAS has suffered loss and continues to suffer damages in an amount in excess of $1,200,000,00.

### COUNT I (Breach of Contract)

52. Plaintiff restates the allegations contained in the preceding paragraphs and incorporate them herein by reference as though fully set forth herein.

53. CFAS has complied with all terms and conditions of the Policy.

54. All conditions precedent have occurred or been performed.

55. CFAS has made a timely claim under the Policy for losses it sustained and continues to sustain as a result of the negligent errors and omissions of its employees and officers in the performance of CFAS's professional services as an independent third-party construction funds administrator.

56. Defendant has wrongfully denied coverage under the Policy.

57. Defendant has wrongfully refused to pay benefits to Plaintiff under the Policy.

58. As a result of Defendant's wrongful denial of coverage under the Policy and refusal to pay benefits as required by the Policy, Defendant is in material breach of its obligations under the Policy.

59. As the result of Defendant's material breach of its obligations under the Policy, CFAS has suffered and continues to suffer damages, including interest, attorney's fees and costs.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendant in an amount in excess of $1,200,000.00, together with an award of pre-judgment interest, post judgment interest, costs or expenses of litigation, reasonable attorneys' fees and such other further relief as this Court may deem appropriate.

**A JURY TRIAL IS DEMANDED ON ALL CLAIMS TRIABLE BY JURY.**

Respectfully submitted,

KAPLIN STEWART MELOFF REITER & STEIN, P.C.

By: *[signature: Kevin G Amadio]*

ROBERT A. KORN, ESQUIRE (PA ID 09229)
KEVIN G. AMADIO, ESQUIRE (PA ID 34735)
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA 19422
(610) 941-2533 (telephone)
(610) 684-2013 (facsimile)
Attorneys for Plaintiffs

Dated: January 3, 2019