# EXHIBIT 1

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                          - - -
 3
        CONSTRUCTION FINANCIAL  : CIVIL ACTION NO.
 4      ADMINISTRATION          :
        SERVICES, LLC, d/b/a,   :
 5      CFAS                    :
                   Plaintiff    :
 6                              :
              vs.               :
 7                              :
        FEDERAL INSURANCE       :
 8      COMPANY                 : 2:19-cv-0020-JMY
                   Defendant
 9
10                       - - -
                Thursday, February 6, 2020
11                       - - -
12              Oral Deposition of RICHARD
13      DOBBS, taken pursuant to notice, at the
14      offices of GORDON REES, 1717 Arch Street,
15      Philadelphia, Pennsylvania, beginning at
16      approximately 8:55 a.m., before Carol McAvey,
17      Registered Professional Reporter and Notary
18      Public, there being present.
19                       * * *
20
21
22
23
24
25      Job No. CS3973354
```

Page 2

```
 1   APPEARANCES:
 2
         KAPLIN, STEWART, MELOFF,
 3       REITER & STEIN, P.C.
         BY: KEVIN G. AMADIO, ESQUIRE
 4       910 Harvest Drive
         Suite 200
 5       P.O. Box 3037
         Blue Bell, Pennsylvania 19422
 6       Phone: 610-941-2533
         kamadio@kaplaw.com
 7       Representing the Plaintiff
 8
         GORDON & REES
 9       SCHULLY MANSUKHANI
         BY: KATHERINE MUSBACH, ESQUIRE
10       One North Franklin
         Suite 800
11       Chicago, Illinois 60606
         Phone: 312-980-6798
12       kmusbach@grsm.com
         Representing the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2                 - - -
 3   WITNESS                         PAGE
 4   RICHARD DOBBS
 5      BY MS. MUSBACH                 5
 6      BY MR. AMADIO                107
 7      BY MS. MUSBACH               110
 8
 9             E X H I B I T S
10                 - - -
11   NUMBER    DESCRIPTION          PAGE
12    25  Notice of Deposition         5
13    26  Affidavit of Tara Finkbeiner 30
14    27  Document Bates stamped      45
15        CFAS000683 - 685
16    28  Document Bates stamped      47
17        CFAS002021 - 2022
18    29  Document Bates stamped      51
19        CAS001797 - 1798
20    30  Document Bates stamped      58
21        FEDERAL000001 - 02
22    31  Document Bates stamped      59
23        CFAS001268 - 1276
24    32  Document Bates stamped      63
25        CFAS001061 - 1062
```

Page 4

```
 1    33  Document Bates stamped      67
 2        FEDERAL000296 - 298
 3    34  Document Bates stamped      79
 4        CFAS000238 - 240
 5    35  Document Bates stamped      81
 6        CFAS002297 - 2298
 7    36  Document Bates stamped      91
 8        FEDERAL000003
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1             RICHARD DOBBS
 2             RICHARD DOBBS, after having
 3   been first duly sworn, was examined and
 4   testified as follows:
 5                 - - -
 6             EXAMINATION
 7                 - - -
 8             (Whereupon, Exhibit 25 was
 9   marked for identification.)
10                 - - -
11   BY MS. MUSBACH:
12   Q.   Can you please state your name for the
13   record?
14   A.   Richard Dobbs.
15   Q.   And Mr. Dobbs, you understand that
16   you're here as the corporate representative
17   for CFAS?
18   A.   I do.
19   Q.   And CFAS stands for Construction
20   Financial Administration Services?
21   A.   Yes.
22   Q.   Have you received a copy of the notice
23   in advance of this deposition?
24   A.   I have.
25   Q.   And you're prepared to talk about the
```

Veritext Legal Solutions
800-567-8658                                              973-410-4098

Page 6

1  RICHARD DOBBS
2  topics in that notice?
3  A.  Yes.
4  Q.  Have you ever been deposed before?
5  A.  I have not.
6  Q.  Well, welcome to your first deposition.
7  A.  I'm very excited.
8  Q.  I'm sure you are.
9      I'm going to ask you a series
10 of questions about the facts related to this
11 lawsuit.
12     A couple things to make it go
13 easier:  If you can just wait until I'm done
14 asking my question until you start answering
15 it, it will make her life a lot easier.
16     Also, if you don't understand
17 a question, just ask me.  I can clarify it.
18 If you answer a question, I'm going to assume
19 you've understood it and you're answering it
20 to the best of your ability.
21     Another thing, verbal
22 responses.  She can't pick up a nod of the
23 head.  It doesn't really fit into the record
24 quite as well.  So just make sure that you say
25 yes or no or use an appropriate response.

Page 7

1  RICHARD DOBBS
2      And then I usually try to take
3  a break every hour.  But if you want to take a
4  break earlier, let me know.  We'll just try to
5  -- I can either get to a good stopping point
6  and then ask if you want a break or if you
7  want one, just answer whatever question is
8  pending and then we can go.
9  A.  Sounds good.
10 Q.  Okay.  What did you do to prepare for
11 today?
12 A.  Reviewed the -- I guess this is a
13 subpoena -- no, deposition notice and reviewed
14 the documents that I had access to that
15 referenced or were related to, I believe, the
16 31 topics that were named.
17     MS. MUSBACH:  And these were
18 all documents that were produced in this
19 litigation?
20     MR. AMADIO:  Yes.
21 BY MS. MUSBACH:
22 Q.  Did you talk to anybody?
23 A.  Kevin and I went through the documents
24 and the items that we were talking about.
25 Q.  Okay.  And then did you talk to anybody

Page 8

1  RICHARD DOBBS
2  besides your attorney?
3  A.  Yeah, I did talk to the other partners,
4  some of the other partners involved in CFAS;
5  specifically Joe Cecere, who is now currently
6  the president; Don Morse, who is the managing
7  member and Scott Mahorsky, who is a partner in
8  Keys Funding.
9  Q.  Would you mind spelling Joe's last name,
10 please?
11 A.  C-E-E-R-E, I think.  I know there's
12 another C in there, isn't there?
13     MR. AMADIO:  It's C-E-C-E-R-E.
14     THE WITNESS:  That's why I
15 brought Kevin.
16 BY MS. MUSBACH:
17 Q.  Okay.  And then Don Morse is the
18 managing member?
19 A.  Yes.
20 Q.  And what does that mean?  What's his
21 role as managing member?
22 A.  Mainly he was -- has the -- and I'm not
23 even sure what managing member means.  But
24 somebody had to be managing member.  There's
25 no real -- I think there's some legal things

Page 9

1  RICHARD DOBBS
2  about it, but I don't know what those are, to
3  be honest with you.
4  Q.  Does he operate as the board
5  essentially?
6  A.  No.  All the partners get together for
7  any decisions.  But I don't know why he was --
8  I don't know -- I don't know the legal reasons
9  for him being managing member.  I think there
10 had to be one.  So I don't know.
11 Q.  And then how does his function differ
12 from the function of the president?
13 A.  Don is not involved in the day-to-day
14 operations of CFAS.  Joe Cecere runs the
15 operation.
16 Q.  And when was Joe Cecere hired?
17 A.  A specific date -- I don't know the
18 specific date.  Joe's been there, I believe,
19 since the end of 2018.  I believe it was
20 December of 2018.  I don't know for sure.
21 Q.  And are there any other employees
22 besides Joe Cecere?
23 A.  Yes, there is one other employee.  I
24 can't remember his last name, Craig that works
25 with Joe.  I can't remember Craig's last name

3 (Pages 6 - 9)

Page 10

RICHARD DOBBS

1 right now.
2 Q. Does Troy Zema still work for CFAS?
3 A. Troy does not. Troy left the
4 employment.
5 Q. And did he leave voluntarily?
6 A. Uh-hum.
7 Q. Did he leave around the same time as
8 John Fullmer?
9 A. No, Troy left mid 2018, I believe.
10 Q. And does Craig fill Troy's roles
11 basically?
12 A. Yes.
13 Q. And then what's the relationship between
14 Keys Funding and CFAS?
15 A. Keys Funding is a 49 percent owner of
16 CFAS.
17 Q. And who owns the other 51 percent?
18 A. Don Morse owns 41 percent and John
19 Fullmer owns 10 percent.
20 Q. What's the relationship between Keys
21 Funding and Mahorsky Group?
22 A. Common ownership.
23 Q. Is there any corporate relationship
24 between the companies?

Page 11

RICHARD DOBBS

1 A. Outside of common ownership, no.
2 Q. And by common ownership, you just mean
3 Scott Mahorsky owns the company?
4 A. Scott Mahorsky is one of the
5 shareholders. I'm a shareholder of both and
6 Russ Wilson is a shareholder of both as well.
7 Q. And if you can briefly just go over your
8 educational background?
9 A. I graduated from high school. I
10 graduated from Marquette University with a
11 bachelor's in finance in 1990.
12 Q. Do you have any degrees beyond that?
13 A. No.
14 Q. What's your work background?
15 A. I worked in the surety industry since
16 1990, 21 years of that with surety companies.
17 In 2011, I became a partner in Mahorsky Group.
18 Q. And then you've worked at Mahorsky
19 Group --
20 A. Since.
21 Q. -- since 2011?
22     And what have your roles in
23 Mahorsky Group been?
24 A. I'm a vice president and secretary of

Page 12

RICHARD DOBBS

1 the operation. I operated as internal
2 underwriter and operations manager.
3 Q. And then what are your responsibilities
4 with relation to CFAS?
5 A. I am the designated partner from Keys
6 Funding for all the conversations and
7 discussions with CFAS.
8 Q. Do you have any other Mahorsky Group
9 companies that you are responsible for?
10 A. We do. We have another operation called
11 Brick Procurement.
12 Q. And is that similar to CFAS or does it
13 have a different --
14 A. Different operation.
15 Q. And you understand that we're here today
16 about a lawsuit involving insurance coverage?
17 A. Yes.
18 Q. And you understand that CFAS has
19 submitted an insurance claim for two wire
20 transfers?
21 A. I do.
22 Q. And you understand that those wire
23 transfers relate to two e-mails?
24 A. Yes.

Page 13

RICHARD DOBBS

1 Q. Or a series of e-mails that we're going
2 to talk about today.
3 A. Yes.
4 Q. Okay. I want to talk through a little
5 bit of background information. I'll show you
6 an exhibit in a minute, but I find they tend
7 to get in the way of getting some background
8 out.
9     So, SWF Constructors, what was
10 that?
11 A. SWF Contractors is a client of CFAS.
12 Q. And SWF Constructors was a joint venture
13 between two different companies; correct?
14 A. Correct.
15 Q. SWF Constructors was a joint venture
16 between Coastal Environmental Group and the
17 Burgos Group; is that correct?
18 A. Correct.
19 Q. Had SWF Constructors -- I'm sorry, was
20 it SWF Constructors or SWF Contractors?
21 A. I don't know, to be honest with you. I
22 always just referred to it as SWF.
23 Q. Okay. Had SWF had projects with CFAS
24 before this one?

Page 14

RICHARD DOBBS

2 A. This was SWF's first contract as a joint
3 venture.
4 Q. And the contract you're talking about is
5 a contract for a border replacement project?
6 A. Correct.
7 Q. And so SWF was awarded a government
8 contract to replace a section of border wall;
9 is that correct?
10 A. Correct.
11 Q. And then SWF contracted with CFAS to
12 provide funds administration services; is that
13 correct?
14 A. Yes, yes.
15 Q. Am I understanding the contract?
16 A. It was a condition of the surety bond
17 provided to SWF that they use a funds control
18 administration company. CFAS was that
19 company.
20 Q. And what were the services that CFAS
21 provided?
22 A. CFAS's job is essentially to receive and
23 disburse funds on contracts. It is put in
24 place generally by sureties in order to
25 protect their rights to the money and make

Page 15

RICHARD DOBBS

2 sure that those funds are delivered to the
3 appropriate suppliers and subcontractors in
4 order to prevent or minimize the risk of
5 performance and payment claims on those
6 projects.
7 Q. And so part of CFAS's job is to protect
8 the surety, too; is that correct?
9 A. That's really the big job that they
10 have.
11 Q. Okay. And that's important because the
12 surety is guaranteeing SWF's performance on
13 the government contract?
14 A. Performance and payment. There are two
15 bonds; there's a performance bond and a
16 payment bond, which the surety has liability
17 for.
18 Q. And during the course of this project,
19 SWF communicated with CFAS about disbursement
20 requests; correct?
21 A. Correct.
22 Q. And those requests were generally sent
23 via e-mail?
24 A. That's my understanding.
25 Q. And the e-mail addresses that were used

Page 16

RICHARD DOBBS

2 were actually Coastal Group e-mail addresses;
3 is that correct?
4 A. I would say partially. I believe there
5 were some Burgos e-mail addresses as well.
6 Q. Let me show you what has previously been
7 marked as Defendant's Exhibit 2.
8     Did you review this document
9 in preparation for your deposition today?
10 A. Yes.
11 Q. And this document is an affidavit that
12 John Fullmer gave in an action entitled
13 Construction Financial Administration Services
14 versus HK Canopy Technology Limited; is that
15 correct?
16 A. Correct.
17 Q. And this affidavit was prepared by
18 Mr. Fullmer and CFAS's attorneys; is that
19 correct?
20 A. I believe so.
21 Q. And does CFAS dispute any of the facts
22 contained in this affidavit?
23 A. No.
24 Q. All right. So looking at Paragraph 12,
25 Mr. Fullmer writes that over the course of the

Page 17

RICHARD DOBBS

2 project, he would liaise with the contractor
3 by e-mail from his e-mail account,
4 jfullmer@cfasllc.com.
5     And that's John Fullmer's
6 e-mail address that he used at CFAS, right?
7 A. I believe so.
8 Q. And then CFAS's contacts at SWF or
9 Coastal were an individual named Tara
10 Finkbeiner and an individual named Rick Silva;
11 correct?
12 A. I believe so.
13 Q. And Rick Silva used the e-mail address
14 rsilva@coastalgrp.net, C-O-A-S-T-A-L-G-R-P.
15 N-E-T?
16 A. I believe that's correct.
17 Q. And then Tara Finkbeiner used the e-mail
18 address tfinkbeiner, T-F-I-N-K-B-E-I-N-E-R
19 @coastalgrp.net, C-O-A-S-T-A-L-G-R-P.N-E-T;
20 correct?
21 A. I believe so.
22 Q. And then at some point, Ms. Finkbeiner's
23 e-mail address was hacked; right?
24     MR. AMADIO: Objection to
25 form.

Page 18

RICHARD DOBBS

BY MS. MUSBACH:
Q. On Paragraph 14, Mr. Fullmer says: I subsequently discovered that the e-mail account of my CEG contacts had been hacked.
      Is it CFAS's understanding that the e-mail address of tfinkbeiner@coastalgrp.net had been hacked at some point?
A. From the experts that we hired or that worked for CFAS researched it, and that was their determination.
Q. And I want to go through a series of e-mails. If you look -- I don't know if you're familiar with Bates stamps, but down in the right-hand corner, there is what we call Bates stamps. They're just numbers that we give to documents. They start with CFAS.
A. Okay.
Q. And so going to CFAS 3529, I want to walk through some of those e-mails.
      So the first e-mail that Mr. Fullmer includes in his affidavit is an e-mail that says we received $1,692,441.91 into the escrow account of SWF last night.

Page 19

RICHARD DOBBS

      Do you see that?
A. Yes.
Q. Okay. And then subsequent to that e-mail, on April 9, 2018, is an e-mail that Mr. Fullmer received from Ms. Finkbeiner's e-mail account; is that correct?
A. Correct.
Q. And this e-mail directed Mr. Fullmer to complete -- it says: Completed the attached wire transfer for Rick this morning. Rick is traveling. E-mail me once the transfer is completed.
A. (Witness nodded.)
Q. And then do you see attached to this e-mail an invoice with banking information?
A. Yes.
Q. And so, there was somebody who was using Ms. Finkbeiner's e-mail address to send an e-mail to Mr. Fullmer directing him to send a wire transfer to a bank account in Hong Kong?
A. From what our experts tell us, that's the case.
Q. And did Mr. Fullmer review any other information besides this e-mail or talk to

Page 20

RICHARD DOBBS

anyone else after receiving this e-mail?
A. Per the deposition and affidavit that Mr. Fullmer gave, I do not believe he did.
Q. And then based on this e-mail, he sent a wire transfer to Hong Kong in the amount of $600,000; is that correct?
A. That is correct.
Q. And the e-mail had all of the information he needed to send the wire transfer; it had the amount of the wire transfer, correct?
A. Technically, to send a wire transfer, the information was there. In order for him to release the funds, he did not follow the procedures needed to release the money.
Q. Okay. But he was able to send the wire transfer based only on the information in the e-mail?
      He didn't need any other information in order to send the wire transfer?
      MR. AMADIO: Objection to form.
      MS. MUSBACH: I'll ask a

Page 21

RICHARD DOBBS

better question. That was a complicated one.
BY MS. MUSBACH:
Q. So in order to send the e-mail -- in order to send the wire transfer, Mr. Fullmer only needed the information in the e-mail; he didn't receive any information about the amount of the wire transfer, the bank account for the wire transfer -- you know what, I actually need to ask you about another e-mail first. Sorry.
      So if you turn to the next page, CFAS 3533, Mr. Fullmer then e-mailed Tara Finkbeiner back at her actual e-mail address and he asked if she had a purchase order; is that correct?
A. Correct.
Q. And then she responded and she said that Rick will get you the purchase order that ties the invoice once he's back. He says it's important this goes out today.
      Is that correct?
A. That's correct.
Q. And then he subsequently followed up and he asked for an intermediary institution.

Page 22

RICHARD DOBBS

1  Do you see that?
2
3  A.  Yes.
4  Q.  And then the person using Ms.
5  Finkbeiner's e-mail account responded and
6  said: Use Citibank as the intermediary bank
7  and there's a redaction mark redacting a
8  number as the fed routing number as requested.
9     Do you see that?
10 A.  I do.
11 Q.  And so then after that, did Mr. Fullmer
12 send the wire transfer?
13 A.  That's my understanding.
14 Q.  Okay.  So between the federal routing
15 number and CFAS 3536 and the banking
16 information attached to the e-mail at CFAS
17 3532, he had all the information he needed to
18 send the wire transfer?
19     MR. AMADIO:  Objection to
20 form.
21 BY MS. MUSBACH:
22 Q.  Correct?
23 A.  I'm not sure I understand the question.
24     I would say partially, in that
25 he had the ability to do the function of

Page 23

RICHARD DOBBS

1
2  sending the wire transfer.  But as stated
3  before, he still had not gathered the
4  documents necessary to approve the sending of
5  the wire.
6  Q.  Okay.  So in order to send the wire, he
7  didn't need anything besides the information
8  on the e-mailed invoice at CFAS 3532 and the
9  intermediary bank information at CFAS 3536?
10     MR. AMADIO:  Objection to
11 form.
12     THE WITNESS:  It's the same
13 answer.  Technically, again, he had the
14 information needed to send a wire transfer;
15 but he did not have the applicable documents
16 required by our standard operating procedures
17 to actually send the wire transfer.
18 BY MS. MUSBACH:
19 Q.  Okay.  So he was physically able to --
20 or I don't know if "physically" is the right
21 word.
22     He was able to actually send a
23 wire transfer based on the information in CFAS
24 3532 and CFAS 3536?
25     MR. AMADIO:  Objection to the

Page 24

RICHARD DOBBS

1
2  form.
3     THE WITNESS:  He can
4  technically send the wire transfer.  However,
5  he did not have the -- had not met the
6  standard or the applicable documents to
7  approve the transfer.
8  BY MS. MUSBACH:
9  Q.  And the applicable documents didn't
10 prevent the wire transfer from going out?
11 A.  According to his testimony, no.
12 Q.  So the wire transfer still went to Hong
13 Kong even though he didn't have the applicable
14 documents?
15 A.  Correct.
16 Q.  And then after that e-mail, Mr. Fullmer
17 received a second request to wire transfer
18 money to Hong Kong; is that correct?
19 A.  Correct.
20 Q.  And that request to transfer money to
21 Hong Kong came from the actual e-mail address
22 of Tara Finkbeiner; correct?
23 A.  According to our IT expert, yes, it did.
24 Q.  And this second request to wire transfer
25 money to Hong Kong is at CFAS 3538 through

Page 25

RICHARD DOBBS

1
2  CFAS 3540; correct?
3  A.  Correct.
4  Q.  And this e-mail also attached to it all
5  of the information needed to input and send
6  the wire transfer to Hong Kong; correct?
7  A.  As stated before, the technical numbers
8  to send a wire transfer were provided.
9     However, the applicable
10 documents, specifically the disbursement
11 summary, disbursement voucher, the signed lien
12 waivers, an invoice which identifies the job
13 correctly and the actual specific items were
14 not provided.
15     So he did not have the
16 documents needed to approve the sending of
17 this.
18 Q.  And despite not having the documents to
19 approve the sending of this, he was still able
20 to physically send the wire transfer with the
21 information in this e-mail; correct?
22 A.  Yes.
23 Q.  And these e-mails sent from
24 Ms. Finkbeiner's e-mail address requesting the
25 wire transfers, they also copied an e-mail

Page 82

RICHARD DOBBS

2 this is a copy of the check from Hang Seng
3 Bank that was deposited into the SWF account?
4 A. Correct.
5 Q. And these funds are funds from the bank
6 account that the $1,300,000 was wire
7 transferred into that had not yet been removed
8 by the perpetrator?
9 A. That's my understanding.
10 Q. And it's payable to Winston & Strawn,
11 which was CFAS's attorney?
12 A. I believe so.
13 Q. And then has CFAS repaid the two loans,
14 the $250,000 and the $750,000 loan?
15 A. Partial repayment has been made on the
16 loan to FIA, First Indemnity of America.
17 Q. Okay. And what about the other loan?
18 A. No payments have been made on that one.
19 Q. Have either of the loans been forgiven
20 in whole or in part?
21 A. No.
22 Q. And then has CFAS put any other money
23 back into the SWF account?
24 A. No. They did, however, as part of the
25 agreement, waive their fees for the remainder

Page 83

RICHARD DOBBS

2 of the Calexico wall project.
3 Q. And so the fees for the remainder of the
4 project, those were fees that CFAS was going
5 to earn on --
6 A. CFAS was due one percent of the total
7 contract price as a fee, and they waived their
8 remaining fees since April of 2018.
9 Q. And prior to April, had CFAS received
10 fees?
11 A. I believe they had collected
12 approximately $35,000.
13 Q. Okay. And then from April forward,
14 there were -- would you call them servicing
15 fees that CFAS was going to earn on the
16 account?
17 A. Yes.
18 Q. And CFAS just agreed not to take the
19 servicing fees from April forward?
20 A. Correct.
21 Q. And outside of the $750,000 loan, the
22 $250,000 loan and the agreement not to take
23 servicing fees from April 2018 forward, did
24 CFAS otherwise put any money into the SWF
25 account?

Page 84

RICHARD DOBBS

2 A. The 127.
3 Q. Okay. And then $127,000 from Hang Seng
4 Bank that was recovered from the account the
5 funds were wire transferred into, correct?
6 A. I don't think so. I mean, I don't think
7 there was any other money put in.
8 Q. There was no other money --
9 A. Right.
10 Q. -- recovered from --
11 A. Oh, no, there was definitely no more
12 money -- no other money has been recovered.
13 Q. There was no other money removed from
14 Hang Seng Bank and then there were no other
15 funds that were put into the SWF account?
16 A. Correct.
17 Q. Okay. And then did CFAS claim any other
18 damages as part of its insurance claim?
19 A. Well, I believe the insurance claim
20 includes the fees associated with recovering
21 the $127,000. Approximately, I believe it was
22 approximately $50,000 in legal fees, I
23 believe, is part of how we came to our
24 determination.
25 Q. Does CFAS have a record of those fees?

Page 85

RICHARD DOBBS

2 A. I'm sure they do. I don't have it with
3 me.
4 Q. Or an invoice? You were invoiced for
5 them presumably?
6 A. Yes.
7     MS. MUSBACH: I'll represent
8 those haven't been produced.
9 BY MS. MUSBACH:
10 Q. All right. And then when did CFAS start
11 doing business?
12 A. I believe it was 2016. '15, '16, end of
13 '15, into '16, I believe.
14 Q. And in 2015, 2016, who was the president
15 of CFAS?
16 A. John Fullmer.
17 Q. And did CFAS have a board?
18 A. No.
19 Q. It just had a managing member?
20 A. Uh-hum.
21 Q. And the managing member, was that
22 also --
23 A. It was Don Morse.
24 Q. Don Morse, okay.
25     And then was Scott Mahorsky

22 (Pages 82 - 85)

Page 86
RICHARD DOBBS
1
2  also involved in CFAS at that time?
3  A.  Scott Mahorsky, as a member of Keys
4  Funding, was involved.
5  Q.  Was there anybody else in the 2015 time
6  period that had an interest in CFAS?
7  A.  Keys Funding, Don Morse and John
8  Fullmer.
9  Q.  How were decisions to purchase insurance
10  made?
11  A.  In consultation with Don Morse and John
12  Fullmer, in consultation with the insurance
13  brokers.
14  Q.  And the insurance brokers was ARC
15  Mid-Atlantic Excess & Surplus?
16  A.  No, it was Murray Insurance.
17  Q.  Murray Insurance, okay.
18      Was there a specific person at
19  Murray Insurance?
20  A.  Joe, and I'm forgetting his last name
21  right now.  I can't remember the gentleman.
22  Q.  And did CFAS discuss its insurance needs
23  internally?
24  A.  I believe so.  I wasn't part of those
25  conversations.

Page 87
RICHARD DOBBS
1
2  Q.  Okay.  And I'm sorry, was there anybody
3  besides Joe at Murray Insurance that discussed
4  CFAS's insurance needs with them?
5  A.  I have no idea.
6  Q.  Besides CFAS's broker, has CFAS
7  discussed its insurance needs with anyone
8  else?
9  A.  I don't know.  I assume -- well, I know
10  they acquired some insurances through brokers,
11  so I would assume that would be the case.
12  Q.  And prior to obtaining insurance through
13  brokers, CFAS had an opportunity to discuss
14  its insurance needs with those brokers?
15  A.  I don't know.
16  Q.  What kinds of insurance did CFAS
17  purchase?
18  A.  E & O insurance is the only one that I
19  actually reviewed.  I don't know what other
20  insurance they have in place.
21  Q.  And did CFAS discuss cyber insurance
22  coverage with its broker?
23  A.  I don't know.
24  Q.  Did CFAS decide to buy cyber insurance?
25  A.  I don't know.

Page 88
RICHARD DOBBS
1
2  Q.  Did CFAS discuss crime insurance
3  coverage with its broker?
4  A.  I don't know.
5  Q.  Did CFAS decide to buy a crime insurance
6  policy?
7  A.  I don't know.
8  Q.  Did CFAS discuss fraudulent instruction
9  endorsements or insurance with its broker?
10  A.  I don't know.
11  Q.  Did CFAS decide to buy a fraudulent
12  instruction endorsement?
13  A.  I don't know.
14  Q.  Did CFAS discuss the risks of social
15  engineering fraud with its broker?
16  A.  I don't know.
17  Q.  Did CFAS decide to buy a policy
18  providing social engineering coverage?
19  A.  I don't know.
20  Q.  And then CFAS first bought this policy
21  in 2015, didn't it?
22  A.  I believe so.
23  Q.  And CFAS was able to discuss the risks
24  it faced and the scope of coverage provided by
25  the policy with the broker prior to purchasing

Page 89
RICHARD DOBBS
1
2  the policy; correct?
3  A.  I know CFAS provided the insurance agent
4  with an application and everything was
5  included on that application.
6  Q.  Did CFAS discuss the risks that it was
7  seeking insurance for with the broker?
8  A.  I was not privy to those conversations.
9  Q.  Who was privy to those conversations?
10  A.  Those would have been Don Morse and John
11  Fullmer, if they occurred.
12  Q.  Did you discuss insurance -- the
13  purchase of insurance policies with them prior
14  to your testimony today?
15  A.  No.
16  Q.  And when CFAS bought the policy in 2015,
17  did CFAS review it?
18  A.  I did not.
19  Q.  Do you know whether Don Morse or John
20  Fullmer reviewed it?
21  A.  I believe they did.
22  Q.  And CFAS was informed the policy had an
23  unauthorized access exclusion, wasn't it?
24  A.  I don't know.
25  Q.  And who would have -- Don Morse would

23 (Pages 86 - 89)