# EXHIBIT 3



**EXPERT WITNESS REPORT OF TY R. SAGALOW**


**Construction Financial Administration Services LLC**

**v.**

**Federal Insurance Company**


**September 23, 2019**

# I

## WITNESS QUALIFICATIONS

1.  My CV is attached as Exhibit B.  In summary, I have been an insurance executive for over 34 years.

2.  From 1987 to 2009, I held various senior positions in AIG including Chief Underwriting Officer and General Counsel of National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), Chief Operating Officer for AIG eBusiness Risk Solutions, a cyber-insurance company, and President of AIG Product Development (General Insurance, Global).  National Union is AIG's subsidiary charged with professional liability and directors and officers liability insurance.

3.  Immediately following my time at AIG until 2012, I was at Zurich North America and The Tower Group, initially in each job as the company's Chief Innovation Officer where I led teams that developed and drafted various insurance policies and products, among other activities.

4.  Since February 2012, I have been Founder & CEO of Innovation Insurance Group, LLC, a consulting firm to the insurance industry, with offices in Short Hill, New Jersey.

5.  Since 2012, I have been a licensed insurance broker in several states.

6.  Since 2013, part of my consulting practice has included serving as an expert witness in insurance coverage, underwriting, claims and insurance brokerage matters, advice and counsel to both policyholders, insurers and insurance brokers for various types of insurance products.  For example, I have personally reviewed and been consulted on many policy language changes in liability policies, both on a primary and excess basis. I also regularly advise insurance companies and policyholders on issues of word choice, grammar, sentence construction, clarity and placement of provisions in the policy, to make the insurance policy readable and understandable to a purchaser.  These consultations typically can include an analysis of underwriting and claims decisions. This involves when to include or not to include a coverage exclusion or other restrictions or conditions to the policy. This analysis also looks at the impact of such decisions on coverage,  the reasonable expectations of the insured, and questions to be asked and information to be gathered during the underwriting process and in the insurance application.

7.      I have been so retained over 79 times.  I have testified as an insurance expert
        approximately 29 times, 4 times at trial.  I have been affirmatively held to be an
        insurance expert under Federal Rules of Civil Procedure Rule 702 by the United States
        District Court for the Southern District of California and testified at trial as an
        insurance expert in that matter.  Details of these engagements are included in my CV.

8.      From August 2015 to July 1, 2017, I was Chief Executive Officer for Lemonade
        Insurance Company and Lemonade Insurance Agency as well as Chief Insurance
        Officer of Lemonade, Inc., in addition to my position at Innovation Insurance Group,
        LLC.

9.      As a chief underwriting officer at AIG's National Union subsidiary, I was responsible
        for major underwriting decisions for one of the world's largest liability insurance
        carriers.  As Assistant General Counsel and then General Counsel, I personally wrote,
        or led a team that wrote, all the insurance policies that National Union produced from
        1988 to 2000.  In these capacities I supervised the drafting of various liability insurance
        applications and was charged with the creation and implementation of underwriting
        rules geared toward the understanding of risk including the requirement of various risk
        management or loss control requirements.  These policies include both primary and
        excess liability insurance.

10.     AIG eBusiness Risk Solutions is a cyber risk insurance company.  As its founding
        Chief Operating Officer (from 2000 to 2004), I was responsible for the profit and loss
        (P&L) for its insurance operations.  Given that the division was relatively small, I had
        responsibilities for the policy language, underwriting intent and brokerage relations.  In
        conjunction with this, I frequently had to give speeches or write articles regarding cyber
        risk insurance and underwriting.

11.     As Chief Underwriting Officer of National Union, I had frequent contact with senior
        members of the claims department.  As a matter of process, both senior underwriters
        and senior claims personnel worked hand in hand in the creation of new insurance
        policies. This occurred for every major new policy. I also participated in major claims
        meetings. These meetings occurred several times a year.  It also was commonplace for
        me and the head of claims to discuss coverage positions on potential claims submitted

to the company.  It would not be uncommon for this type of conversation to occur at least once a week.

12.  I have taught seminars on proper claims-handling process for the Claims Litigation Management Alliance's "Claims College".  I have taught in the following subject areas, which have included teaching the approaches to interpreting policy language including claims handling issues. Examples include:

- The Proper Role of the Claims Examiner,
- Stakeholders to Consider in the Claims Process, and
- Best practices in communication and coordination in Claims.

13.  I graduated *summa cum laude* from Long Island University, *cum laude* from Georgetown University Law Center, and I have an L.L.M. from New York University Law School.  I am also a licensed P&C broker in several states.

14.  I am the author and/or co-author of several works in the field of D&O insurance and new product development.  Details of these publications are included in my CV.

**15.**  I have spoken before numerous forums in my lengthy career.  Details are included in my CV and on my website, innovationinsurancegroup.com.

## II

## COMPENSATION

16.  I am being compensated at a rate of $795 per hour[1].  Days at trial and depositions have a minimum of eight hours.  My compensation is not dependent upon my findings or the outcome in this matter.

## III

## DATA CONSIDERED

17.  I reviewed and considered the documentation listed in Appendix A of this report in reaching my conclusions.

---

[1] It is my understanding that IMS Expert Witness Services, the company through whom I was retained, adds another $210 per hour to the retaining law firm invoice for the services they render in connection with this matter.

18.     In addition to the above documents, in reaching the opinions expressed herein, I relied upon my education and my knowledge of the insurance industry custom and practice as it relates to the subjects discussed, gained from my thirty-plus years of experience as a chief underwriting officer, general counsel and chief innovation officer of large insurance companies. Further, my opinions are also based on my extensive experience in almost 80 cases representing policyholders, insurance carriers and third parties in insurance disputes and other related insurance matters.  Some of my opinions may be the result of personal experiences, and others as a result of general industry knowledge gathered over the decades of operating in the insurance industry.  My opinions in this matter are a result of my knowledge, skill, experience, training, and education I've received from the insurance industry over the course of three decades in specialized matters which, it is my hope, may help the trier of fact to understand the evidence or to determine a fact in issue.

19.     To the extent indicated in the list of materials or otherwise in this report, or otherwise used for this report, I may have also relied upon materials I have written or speeches I have given on the subject matter of this dispute.

20.     I am aware that discovery is on-going and that additional documents may be provided to me to review in the future.  I reserve my right to amend this report upon review of such additional information.

**IV**

**<u>SUMMARY OF FACTS</u>**

21.     On or about August 21, 2017, Construction Financial Administration Services ("CFAS" or the "Insured") purchased a professional errors and omissions ("E&O") policy from Federal Insurance Company ("Federal" or "Chubb"), a member of the Chubb Group of Insurance Companies, for the policy period August 21, 2017 to August 21, 2018, Policy No. 8243-6189 (the "Policy").   Subject to its terms, the Policy provides $2,000,000 in coverage, excess of a $5,000 retention, for Claims made against the Insured for Wrongful Acts committed by the Insured solely in the performance of or failure to

perform Insured Services.  Insured Services is described in the Insured's application for insurance as "Construction Project Funds Administration".[2]

22.   On November 9, 2017 SWF Constructors ("SWF" or the "Claimant"), a joint venture between Coastal Environmental Group and Burgos Group, entered into an agreement with the US Army Engineer District – Fort Worth ("Project Owner") to perform certain fence replacement work in Calexico, CA.  The project was called "D/B Calexico Fence Replacement 2 Miles Calexico, California – W9126G-18-D-0010" ("Project").

23.   In conjunction with the Project, SWF obtains an approximate $11 million[3] surety bond through the Mahorsky Group. Among other conditions the surety required that SWF use the services of an funds administrator whose job would be to receive the funds from the Project Owner and release those funds to SWF and the Project's subcontractors and supplies pursuant to agreed terms and conditions.

24.   On November 14, 2017, SWF enters into such a funds administration agreement ("Funds Administration Agreement") with the Insured.  The agreement required that SWF provide CFAS a number of documents at the initiation of the Project, including[4]:

       i.   A copy of the Contract as well as all change orders and revised schedule of values

      ii.   A copy of all subcontract agreements purchase orders

     iii.   Itemized budget of costs

      iv.   Updated construction schedules

       v.   Any liens, claims or notices received from subcontractors or suppliers

      vi.   Monthly billings submitted to Obligee [Project Owner] by Principal [SWF]

---

[2] Chubb ProE&O Renewal Application for Construction Financial Administration Services, LLC dba CFAS dated 6/21/17 ("Application"), section II.4.  Also see Application section II.2.
[3] Later an additional change order was put in for another $7 to $8 million. (Deposition of John Fullmer at 73:4-5)
[4] Funds Administration and Disbursement Agreement at section 3.4

25.     In addition to the above, each time SWF requested a payment be made by CFAS out of the disbursement account set up for the Project ("Disbursement Account"), SWF was required to submit additional supporting documentation for such payment including[5]:

   i.   A Disbursement Vouchers in the forms provided in the contract ("Complete Distribution Voucher" or "Marked-up Payment Application") which identify:

      1. Subcontractor or supplier to be paid
      2. Amount to be paid
      3. All applicable CSI codes, line item number and their relationship to the Schedule of values previously submitted
      4. Supporting documentation, e.g. copies of underlying invoices for work completed or supplies delivered, and

   ii.  A properly signed and executed Release and Lien Waiver in the form provided in the contract ("Release and Lien Waiver")

26.     CFAS was required to  verify that it had received all the required documentation prior to distributing any funds[6].

27.     Prior to April 9, 2018, SWF had provided CFAS with all the required documentation in conjunction with any request to distribute funds[7], in compliance with the required procedure.

28.     On Friday, April 6, 2018, the Project Owner sent to CFAS $1,692,441.91 for deposit. CFAS deposited such funds in the Project's Disbursement Account.  CFAS emailed SWF to advise them that funds have been received so that they could prepare the proper documentation for any required payments[8].

---

[5] *Ibid* at section 3.7
[6] Construction Financial Administration Services LLC D/B/A CFAS v. Federal Insurance Company Complaint ("Complaint") at paragraphs 14-16; Declaration of John Fullmer, paragraph 7
[7] *Ibid* at paragraphs 22-23; Declaration of John Fullmer, paragraphs 16-17
[8] Deposition of John Fullmer at 34:13-20

**The $1.3 million Theft**

<u>Monday, April 9, 2018: The First Transfer</u>

29.     On the following Monday, April 9, 2018 at 10:02am, Mr. John Fullmer, the President of CFAS, received an email what was purported to be from one of CFAS's main contacts at SWF, Ms. Tara Finkbeiner, from her correct email address at CFAS (<u>tfinkbeiner@coastalgrp.net</u>), cc'd to her boss, the President of SWF, Mr. Rick Silva. The email was a forward of an email purported to be from Mr. Silva at his correct email address (<u>rsilva@coastalgrp.net</u>) directing Ms. Finkbeiner to contact CFAS to wire $600,000 "from the funds received on Friday" to "HK Canopy Technology Limited" by wire transfer to a HK Canopy's bank in Hong Kong.  The email stated "Please completed the attached wire transfer for Rick this morning. Rick is traveling email me once transfer is completed" [sic] [9]

30.     While the email did attach an "invoice", the "invoice" made no reference to the Project and the email did not attach a Completed Distribution Voucher nor a Release and Lien Waiver, nor was HK Canopy Technology Limited in SWF's budget listed as a subcontractor or supplier in the Insured's records and there was no record of a contract between SWF and a HK Canopy Technology Limited in the Insured's files[10].

31.     At 10:15am, Mr. Fullmer emailed Ms. Finkbeiner, cc'd to Silva, requesting a copy of a purchase order that ties the invoice for $600,000 with the Project[11].  He did not (at least at that time) ask for a Completed Distribution Voucher nor a Release and Lien Waiver despite the fact that there are required under the Funds Administration Agreement.

32.     At 10:32am, in response to Mr. Fullmer's request, an email was received purported to be from Ms. Finkbeiner using her correct email address,[12]  In that response, Mr.

---

[9] Affidavit of John Markley Fullmer, Jr. to the High Court of Hong Kong ("Fullmer Affidavit") at para 19
[10] Complaint at para 26-27; Declaration of John Fullmer, paragraph 18
[11] Fullmer Affidavit at para 20
[12] The person emailing from Tara Finkbeiner's account added a cc on the emails to Rick Silva at an incorrect email address; specifically, at a variation of Coastal's domain which added an extra "l" to Coastal Group's correct domain (i.e. "rsilva@coastallgrp.net").  According to Richard Stoneberg's expert report, adding such a cc allows the person emailing to monitor the email exchanges.  It was later determined that HK Canopy, a Hong Kong company whose sole shareholder is Mr. Wang Yongchun, a Chinese national, had through a newly created entity, Kailkun Ltd,

Fullmer was told that Mr. Silva will get "the purchase order that ties the invoice to the SWF project once he is back" and that Mr. Silva said it is important that the money goes out today.[13]

33.     Within the hour or so, Mr. Fullmer wired the $600,000 to the Hong Kong account and advised SWF of this transfer at 11:25am.

Tuesday, April 10, 2018: The Second Transfer

34.     The next day, Tuesday, April 10, 2018, 9:37am, Mr. Fullmer received another email purported to be from Ms. Finkbeiner (at her correct email address) forwarding a purported email from Mr. Silva asking for a $700,000 payment to be made to the same Hong Kong account.  Again, while an invoice was attached, the invoice made no reference to the Project and there was no supporting documentation, Completed Disbursement Voucher nor Release and Lien Waiver. The email stated that "[w]e need to complete the payment today" further indicating that Mr. Silva is "still traveling" and will send "all necessary document to back the transfer up tomorrow morning" [sic][14]

35.     At 11:59am, Mr. Fullmer wired the $700,000 to the Hong Kong bank account.

36.     On Tuesday, April 10, 2018 at 1:55pm, approximately two hours after sending the $700,000, Mr. Fullmer received a legitimate request from Ms. Finkbeiner with a disbursement voucher for $1,615,430.10 to be paid to various subcontractors and suppliers[15] to which Mr. Fullmer replied that due to the two international transfers, there was insufficient money in the disbursement account to pay such payments.

April 11, 2018: Discovery of the theft

37.     On Wednesday, April 11, 2018, at 9:54am, Mr. Fullmer emailed Mr. Finkbeiner, stating "Please submit the backup documents for the two international wires.  No other

---

purchased the domain coastallgrp.com earlier in the month together with requesting from the China Registry the use of "coastalgrp" as their internet keyword along with the China domain names (coastagrp.cn etc). Fullmer Affidavit at para 35.
[13] *Ibid* at para 21
[14] *Ibid* at para 22
[15]*Ibid* at para 28

disbursements will be processed until the valid documentation is received."[16]  At this point, Mr. Fullmer received a "Undeliverable Delivery Status Notification (Failure)" for Mr. Silva's email address[17].

38.   At 10:52am, Mr. Fullmer then re-sent the email to Mr. Silva's <u>correct</u> email address. Five minutes later he received a phone call from Mr. Silva stating that he did not authorize the international wires. Mr. Fullmer quickly got off the phone and said he needed to call FNB, the bank for the Disbursement Account.[18]

39.   At 11:36, Mr. Silva called Mr. Fullmer again this time to tell him that he was having problems sending emails to Ms. Finkbeiner, having tried several times on April 10th with no response from her[19].

40.   On April 11, 2018, Mr. Fullmer reported the theft to numerous enforcement authorities including First National Bank of Pennsylvania (where the Disbursement Account was), Brunswick County Sheriff Office, the FBI and the Hong Kong Police[20].

41.   On April 11, 2018, Mr. Fullmer asked CFAS's IT firm, EZ Micro, to investigate.  EZ Micro reported to Mr. Fullmer at 9:22pm that day:[21]

> the email headers from Tara [Finkbeiner]'s initial wire transfer request originated from her email account but indicate a foreign originating IP address.  Most likely her email account was compromised and … If she did not receive [your] replies, then a third party was likely intercepting her emails [further stating that] the domain Coastallgrp.net was registered on April 9th [and] were likely purchased as part of a targeted attack against Coastal and yourself.

---

[16] *Ibid* at para 30
[17] *Ibid* at para 31.  Mr. Fullmer had cc'd Mr. Silva at the double "l" email address. I note that it is standard practice for internet thieves to shut down the fake email address once the theft has been completed.
[18] *Ibid* at paras 32 and 33
[19] *Ibid* at para 34
[20] *Ibid* at para 37
[21] *Ibid* at para 36

**The Insurance Claim**

42.    On Friday, April 13, 2018, SWF sent to the Insured a written demand ("Claim") reiterating their statement of April 11th that the two Hong Kong transfers were made without authorization and without the required supporting documents.  More specifically, the Claim[22]:

   a.    alleged that the Insured made $1.3 million in unauthorized payments without having in its possession the required supporting documentation,

   b.    demanded the Insured immediately remit the missing $1.3 million back to the Disbursement Account,

   c.    noting that the Project requires payment to subcontractors within seven days of receipt of the funds [the funds were received by CFAS on April 6, 2018 and therefore seven days from that date would be April 13, 2018) and that a failure to make timely payments may have serious repercussions on the to perform the [Project] contract. [sic]

43.    The Claim also requested a copy of any and all insurance policies that may cover this claim including errors and omissions, crime, cyber liability and or fiduciary bonds[23].

44.    Thereupon Insured borrowed $1,000,000 which it deposited into the Disbursement Account in order to partially replenish the $1.3 million Hong Kong payments[24].

45.    On or about April 13, 2018, pursuant to the Completed Disbursement Voucher received on April 11, 2018, the Insured then distributed $1,533,693.68 to various subcontractors and/or suppliers.

46.    The following Tuesday, April 17, 2018,  the Insured submitted the Claim to its insurance company, Federal Insurance Company (Chubb).

47.    On April 24, 2018, Federal acknowledged the Claim and advised CFAS that it was committed to provide the best possible claims service.

---

[22] Complaint at para 32

[23] *Ibid*

[24] Declaration of John Fullmer at paragraph 41. Later, the Insured would advise the Claimant that it would deferring receipt of the] fees it is owed under the contract by not withdrawing the fees from the Disbursement Account to help make up the short fall between the $1.3 million transfer and the $1 million replenishment deposit. (Complaint at paragraph 46; Declaration of John Fullmer at paragraph 24)

48.     On April 30, 2018, the Claimant made a second demand to the Insured for the
        remaining $300,000 stating that the damage to the Claimant was "caused by CFAS's
        failure to follow appropriate and required procedures in the agreement between the
        parties".  On May 23, 2018, Claimant again emailed the Insured regarding the "missing
        $300,000."

49.     On May 22 and May 29, the Insured mailed various documents to Federal to support
        the Claim.

50.     On June 6, 2018, Federal denied coverage for Claim on the basis of two "cyber
        exclusions" on the Policy and reserved its rights on various other grounds.


## V

## ISSUES PRESENTED AND

## SUMMARY OF OPINIONS AND CONCLUSIONS

51.     I have been asked by counsel for CFAS, the insured, to provide an expert opinion on
        the custom and practice of the insurance industry with respect to various provisions of
        the Policy.

52.     Specifically, I have been asked to analyze the following eleven issues under industry
        custom and practice and the facts of this case:

        a.      Whether all terms of an insurance policy should be interpreted pursuant to their
                ordinary meaning or do some terms have a specialized or industry specific
                meaning.

        b.      Whether certain terms in the Federal Policy, including its allocation provisions
                (dealing with "covered matters" and "uncovered matters") as well as the Policy's
                cyber exclusions contain such specialized terms and, if so, what impact that has
                on coverage in this case.

        c.      Whether Federal is acting consistent with custom and practice in denying
                coverage for the Claim under exclusion (e) (as reaffirmed by endorsement #2) and
                endorsement #5 ( "Cyber Exclusions").

d.  Whether Federal is acting consistent with custom and practice in denying coverage for the Claim under exclusion (A)(9) ( "Contract Exclusion").

e.  Whether Federal is acting consistent with custom and practice in denying partial coverage for the Claim as falling within the exception to the definition of Loss for "reimbursement for its return of fees or other compensation" ("Return of Fees Exclusion").

f.  Whether Federal is acting consistent with custom and practice in denying coverage for the Claim under the theory that the Insured was not legally obligated to expend the funds for which the insured is requesting coverage but rather such funds was "merely expended as a business accommodation to SWFC."

g.  Whether Federal is acting consistent with custom and practice in denying coverage for the Claim to the extent that the Insured "failed to mitigate its alleged loss."

h.  Whether the insured would be acting inconsistent with industry custom and practice and in violation of section XI(C) of the policy ("Settlement Provisions") if it loaned or otherwise made a conditional or temporary payment to the Claimant of up to $1.3 million in connection with the Claim for Wrongful Acts made by SWF against the insured.

i.  Whether Federal is acting consistent with custom and practice in denying coverage on the basis of section XII, Allocation, of the Policy.

j.  Whether Federal is acting consistent with custom and practice in denying coverage for the Claim due to the definition of Insured Services ("Insured Services" definition")

k.  Whether the insured was acting consistent with custom and practice in the calculation of its net losses for the Claim.

53.  For the reasons set forth below, it is my professional opinion, to a reasonable degree of professional certainty, based on industry custom and practice, that:

13

a.   An insurance policy contains both words meant to be interpreted by way of their ordinary or common sense meaning as well as words (or phrases) that have a specialized meaning, or a specific meaning, due to industry usage.

b.   Among the specialized meaning words or phrases are the phrase "relative legal exposure" and "covered" and "uncovered" "matters" in section XII, Allocation, of the Policy.

c.   The "relative legal exposure" test together with "covered matters" and "uncovered matters" as set forth in section XII, Allocation of the policy, applying Industry custom and practice, would result in 100% of the loss being allocated to "covered matters" and 0% of the loss being allocated to "uncovered matters" as the *only Wrongful Acts of the Insured* and the only Wrongful Act of any party in the Claim (i.e. not obtaining all the required supporting documents before making the Hong Kong payments fall within the definition of Wrongful Act and other terms of the Policy as "covered matters.")  If the insurance carrier believes that other parties or persons are partially responsible for the damages, including SWF, then their proper recourse under the policy would be a subrogation action, not a denial of payments to their insured.

d.   Similarly, the word "any" in the Policy's cyber exclusions, despite its common sense meaning, must be viewed in its context within the wording of the exclusions and in conjunction with the policy as a whole, and is designed to be applied consistent with the overall history and intent of cyber exclusions in non-cyber insurance policies.  Specifically, denying the Claim by reason of the Cyber Exclusions is inconsistent with industry custom and practice taking into consideration the underwriting intent behind such Cyber Exclusions and the circumstances in which they are meant to apply.  More specifically, the underwriting intent of the exclusion is to apply only to attacks against the *insured's* computer systems, risks that the insured can insure by buying another policy from the insurer or its competitors (i.e. a cyber insurance policy).

e.  I also note that in cases where there are multiple possible causes of the cyber-attack, the exclusion would not apply even under Federal's interpretation if Federal fails to prove to the finder of fact that the attack was a result of unauthorized access or use as opposed to some other cause.

f.  Denying the Claim by reason of the Contract Exclusion is inconsistent with industry custom and practice in so far as the liability of the insured exists absent the contract, an express carve-out to the exclusion.

g.  Denying the Claim by reason of the Return of Fees Exclusion is inconsistent with industry custom and practice since the claimant is not asking for a return of fees potentially triggering the exclusion.

h.  Denying the Claim on the theory that any payment made by the insured was "merely a business accommodation" is inconsistent with industry custom and practice as such payments were made directly as a result of allegations of Wrongful Acts by the Insured which was alleged to have caused $1.3 million in damages to the Claimant.

i.  Denying the Claim on the theory that the insured failed to mitigate its alleged loss is inconsistent with industry custom and practice as there is no requirement in the Policy to do so.  In addition, the documentation I reviewed did not indicate any such failure to mitigate even if there was such a requirement.

j.  The Insured would not be acting inconsistent with industry custom and practice and would not be violating the Settlement Provisions of the policy to loan or otherwise make a conditional or temporary payment to the Claimant by way of a deposit into the Disbursement Account under circumstances where the Insured or its subrogee (including Federal) would be legally permitted to recover from the Claimant or appropriate other party the insured's Disbursement Account deposit in the event the insured is not liable for any loss suffered by the Claimant.  The documentation I have reviewed tends to support that is what the parties to the payment intended in this case and statements by the Insured's former counsel to

the effect that the Insured will only use amounts in the Disbursement Account to make payments under the Funds Administration Agreement is not contrary to this.

k.  Federal is acting inconsistent with custom and practice in reserving its right to deny or in denying coverage for the Claim due to the definition of Insured Services ("Insured Services" definition").

l.  Other than a $5,000 deduction for the policy's Retention Amount, the Insured acted consistent with custom and practice in its calculation of net losses. Specifically, the documents I reviewed indicate a "gross loss" of $1.3 million minus the net after expenses recovery of  $70,090.05 ($127,007.85 recovery minus $56,917.82 recovery costs) yielding a net loss before policy Retention of $1,229,909.95 and a net loss after policy Retention of $1,224,909.97.

# VI

## DISCUSSION

54.  As a drafter of insurance policies for over thirty years, I know that an insurance policy is composed of words and phrases which carry an ordinary or common sense meaning and ones which carry a specialized or industry specific meaning.

55.  The above statement should not be confused with the fact that insurance policies contain both defined and undefined terms.  Sometimes an author such as myself will choose to define a word but that definition is consistent with an ordinary meaning of the word.  That is to say, the fact that I or another insurance author has chosen to define a word does not necessarily mean it has a "specialized" or non-common sense meaning.

56.  The opposite is equally untrue. That is, it is faulty to assume that every non-defined term or phrase is always meant to carry its common sense meaning.  While it is certainly true that some undefined terms are meant to be seen in their ordinary sense, it

16

is also true that frequently a undefined term or phrase in an insurance policy carries a specialized or industry specific meaning[25].

57.   The above rules are no less true in the case of the Policy at issue in this case.

58.   While my analysis will refer to a couple of places in the Policy where undefined terms carry a specialized meaning, a logical place to begin is with the Policy's Allocation provision.

**Federal's Allocation Provision**

59.   Section XII of the Policy states, in relevant part, that:

XII.   ALLOCATION

If in any **Claim** the **Insureds** incur both **Loss** that is covered by this Policy and also loss that is not covered by this Policy, either because such **Claim** include both *covered and uncovered matters* or because such **Claim** is made against both covered and uncovered parties, then coverage shall apply as follows:

…

(B)   loss other than **Defense Costs**:  all remaining loss incurred by the **Insureds** from such **Claim** will be allocated between covered **Loss** and uncovered loss based upon the *relative legal exposure of the parties* to such matters.

60.   As one of the first authors of the Allocation provision when I was the Chief Underwriting Officer and General Counsel at National Union, the AIG subsidiary

---

[25] See e.g. the recent 9th circuit decision in which the court held that the undefined term "war" is intended by the industry to carry a special meaning as opposed to its common sense or ordinary meaning concluding that the 2014 Israel-Hammas conflict while meeting the definition of "war" in its common sense meaning did not result in the insurance policy's war exclusion to be applied to the insured's loss because "war" has a more restrictive special meaning in the context of an insurance policy that the insured had a right to reasonably rely upon in concluding that there should be coverage for its loss. (*Universal Cable Productions, LLC et al v. Atlantic Specialty Insurance Company*, July 12, 2019, No. 17-56672, 5th Cir.)

charged with management (D&O) and professional liability (E&O) policy underwriting, I understand the history and purpose of the market's Allocation provisions contained in D&O and E&O policies.  Such provisions were originally created in the early 1990s due to the need to allocate between covered directors and officers and what was then the uncovered corporation in the context of a D&O securities claims.  AIG was one the first to recognize the so-called Allocation Problem.

61.    However, Chubb, AIG's main rival, quickly understood that the issue of "allocation" went well beyond the "covered and uncovered parties" in a D&O securities claim and really applied to any type of coverage dispute, whether in a D&O or E&O policy. Accordingly, Chubb led the industry in creating a more comprehensive allocation provision embracing both "covered and uncovered matters" as well as "covered and uncovered parties."

62.    Accordingly, the phrase "covered and uncovered matters" is intended by the insurance industry to be viewed broadly and essentially include any situation where due to any reason loss incurred by an Insured under the policy may arise out of a covered event or "matter" as well as an uncovered event or "matter."

63.    In the case at hand, Chubb is alleging that the loss incurred by its insured arises out of a cyber-attack which, in Chubb's view, is excluded by endorsements #2 and #5 of the Policy.

64.    Further in this report,  I will opine that neither endorsements #2 or #5 in fact apply to the case at hand once those endorsements are viewed in light of how industry custom and practice to have them applied.  However, for the purposes of this section of my report,  I will assume that Chubb is correct and that they do apply.

65.    However, even if such is the case (i.e. the cyber exclusions apply), it is only the *beginning* of a proper coverage analysis, not the end.  The reason is that the plaintiffs in the underlying claim as well as the agreed facts in the case indicate that the insured's loss also occurred, indeed, would not have occurred unless the Insureds failed to adhere

to their own procedures to requiring receipt of required documentation including a Complete Distribution Voucher and Release and Lien Waiver.

66.   In other words, even when viewed in a light most favorable to Federal, there were both covered Wrongful Acts (failure to insist upon receiving the required contractual documents before dispensing the funds) and uncovered Wrongful Acts (the cyber-attack) that led to the loss.  This necessarily leads to an examination and application of Section XII of the Policy.  Notably, Federal admits in its designee's deposition that Section XII was not considered when making its denial of coverage[26], despite its further admission that the failure to obtain the documentation was "secondarily" a cause of the loss[27].

67.   Section XII states that allocation between covered and uncovered matters shall be done pursuant to the Relative Exposure test as described in the section.  Accordingly, our next inquiry is what is the industry's custom and practice when it comes to the phrase "relative legal exposure of the parties?"

68.   When viewed through the lens of industry custom and practice breaks down to two important elements "legal exposure" and "of the parties."

69.   I will take the second phrase, "of the parties," first.  The intent of the insurance industry in including this phrase is to clarify that in reviewing "uncovered matters" it is only the actions of the *parties* (in this case the insured[28]) that count.  In other words, an insurance carrier is not permitted under industry custom and practice to allocate out of an otherwise covered claim loss due to actions of *non-parties* (or, in this case, non-insureds.)  The reason: there is another provision of the policy that gives rights to the insurer for this type of "allocation".  It is called subrogation, discussed again *infra*.

70.   Applying these allocation rules to the current case, the allegedly excluded cyber-attack was not against the insured but rather against SWF, the insured's customer.  More

---

[26] Deposition of Cheryl Napurano at 56:24-57:1
[27] *Ibid* at 34:6-25
[28] The use of the word "parties" as opposed to just saying "the insureds" is to allow the provision to more easily apply to both  "covered and uncovered parties" as well as covered and uncovered matters" scenarios.

importantly, there is no allegation of a Wrongful Act by the insured that resulted in the cyber-attack. Assuming that there was fault or negligence by anyone (and there are arguments that there none as discussed later in my report), it was by SWF.

71.    The above analysis goes hand in hand, at least in this case, with an analysis of the industry phrase, "relative legal exposure" as that phrase in used in the Allocation provision of the Policy.

72.    To explain, the industry uses various language to express what is called the "Relative Exposure" test under D&O and E&O policies[29]. Some include references to relative "financial exposure" as well as relative "benefits" in addition to referring to relative "legal exposure". Indeed, even Federal has policies with these variations[30].

73.    In this case, our analysis is simpler due to Federal's choice of not including relative financial exposure or relative benefits in its allocation provision. Thus, the question in this case then becomes what is the insured's or any defendant in the underlying claim relative *legal* exposure to the uncovered matter of the cyber-attack against SWF? The answer, of course, is zero. There was no fault of any Insured in the cause of the cyber-attack against SWF. It's "relative legal exposure" to the attack is zero.

74.    Finally, it is factually true that that but for the alleged negligent acts of CFAS in not obtaining the required documentation before making any payment, any hacking (if that is what occurred) of SWF's email accounts would have been moot. This concept was

---

[29] This test was created by the insurance industry in the wake of several adverse judicial decisions in the mid-1990s which created a more insured favorable "Greater Settlement" rule test of indemnity allocation.

[30] See e.g. "Executive Protection Portfolio" 14-02-7303 (Ed. 11/2002) D&O policy: "(b) If in any Claim other than a Securities Claim the Insured Persons incur both Loss that is covered under this coverage section and loss that is not covered under this coverage section, either because such Claim includes both covered and non-covered matters or because such Claim is made against both Insured Persons and others (including the Organization), the Insureds and the Company shall allocate such amount between covered Loss and non-covered loss based on the relative legal and financial exposures of the parties to covered and non-covered matters and, in the event of a settlement in such Claim, based also on the relative benefits to the parties from such settlement. The Company shall not be liable under this coverage section for the portion of such amount allocated to non-covered loss." Also see "The Chubb Primary" form 14-02-18480 (03/2012) "The **Insureds** and the Company shall use their best efforts to determine an allocation between **Loss** that is covered and **Loss,** or any other amount, that is not covered based on the relative legal and financial exposures of the covered parties to the covered matters."

expressed by Mr. Fulmer in his testimony as a follow-up comment to a questioned posed by Federal[31]:

> A- May I add to my comment, the last comment that you asked me if – if I relied on the Email from Tara to make wire transfers and my comment was yes. However, if I would have followed our operating procedures, and received the disbursement voucher and all the backup documents, the fact that their Email was hacked would have been a moot point; that, basically, I would not have done the wires[32].

75. In this statement, Mr. Fullmer admits that he understood that the whole purpose of a construction funds administrator is to make sure that with the exception of its own fees 100% of the funds deposited by the Project Owner is used to pay the Project's contractors and vendors.  For this reason it is vital that the funds administrator is provided with documentation that *connects* the invoice requested to be paid to the particular Project.  To help implement this, for example, Mr. Fullmer testified that each Project has its own separate bank account holding the disbursement monies solely connected to that Project.

76. Accordingly, under industry custom and practice, Federal would not be permitted to allocate any loss to "uncovered matters" even if the cyber-attack against SWF had led to the insured's loss.

77. This is not to say that Federal does not have any sort of relief in this matter.  It is just not against its innocent insured. To the extent Federal believes that it has paid loss under its policy which was the fault, in part or in whole, by someone else than section

---

[31] Deposition of John Fullmer at 66:11-17
[32] It is unclear why Mr. Fullmer did not follow the procedures he in fact created for CFAS since, according to Mr. Fullmer, setting up and following these procedures were core to CFAS's purpose in ensuring that payments are made only to proper contractors and vendors, ultimately protecting the surety from having a loss. See Deposition of Mr. Fullmer at 24:21-23.  The closest he gets in explaining his actions is that he does not normally deal with payment requests but these are handled between Ms. Finkbeiner and his assistant, Troy Zema, who makes sure all the required documents are received before even asking Mr. Fullmer to authorize payment. *Ibid* at 60:9-16, and that he was aware that Mr. Silva travels a lot so might be around to send the required documents. *Ibid* at 59:25-60:1-3. However, even Mr. Fullmer, admits that these reasons do not justify his failure follow procedure or the ultimate consequences of that failure.

XVI of the Policy permits Federal to be subrogated "to the extent of such payment" to "all of the **Insured's** right of recovery thereof,"  Thus, at the end of the day, Federal is protected, just not in the way it has argued in its pleadings.

78.     The deposition testimony of Federal's 30(b)(6) witness, Cheryl Napurano, who was also the claims examiner in charge of the insured's Claim, brings further light to the issues discussed above.

79.     In her deposition Cheryl Napurano states that it is the intention of Federal to provide "the best possible claims service."[33]  This is, of course, both an appropriate and worthy promise on Federal's part.  Unfortunately, in several vital respects Ms. Napurano's admissions of Federal's conduct fell short of this promise.

80.     The first failure was Federal's complete lack of taking into consideration the Allocation provision on the Policy as I discussed above.

81.     Federal's denial letter of June 6, 2018 as well as Federal's own underwriting notes to file admit that the only allegation made against the insured was "that CFAS failed to follow the disbursement process outlined in the [CFAS-SWF] Agreement and, *as a result*, made two improper wire transfers from the Disbursement Account to an account with the Hang Seng Bank in Hong Kong."[34] (emphasis added)

82.     The phrase "as a result" is critical as it communicates the heart of the claimant's allegation; to wit, that the claimant suffered damages due to the failure of the insured to obtain the contractually required documentation before making the payments.  Indeed, this is the only allegation the claimant makes.  Yet, despite the fact that such failure obviously is a covered Wrongful Act in the Policy, no attempt is made to review the possible application of the Allocation clause even assuming, as Federal does, that the Cyber Exclusions of the Policy might also apply to the loss.

---

[33] Deposition of Cheryl Napurano at 24:18-25:1; exhibit 31.
[34] See Denial Letter at page 1; Notes to File dated June 6, 2018 (FEDERAL 000414)

83.     In other words, no attempt was made by Federal to *allocate* between the covered cause (failure to obtain the required documents) and the allegedly uncovered cause (the alleged  cyber-attack against SWF)

84.     Ms. Napurano admits as much in her deposition[35]:

Q-    Is there any provision in the policy that deals with what to do when there's covered and uncovered matters?

[after objection]

A-  In this matter I did not get to point of determining whether there would be covered and uncovered allegations[36].

Q-    Is there a policy provision that even deals with that subject?

[after objection]

A-  I was going to say I'll have to review the policy.

Q-  Take out the policy, which is Plaintiff's Exhibit 32, and take a look at Article 12.

        What's article 12 entitled?

A-  Allocation

Q-  Are you familiar with that article?

A-  I am.

Q-  Did you consider that article in connection with the CFAS's claim?

---

[35] Deposition of Cheryl Napurano at 55:15-57:1
[36] I note that this while is an incorrect answer since both the question and the policy does not refer to covered and uncovered allegations but covered and uncovered matters, something intended to go beyond a comparison of allegations only, in this case, if a claims examiner were only to review allegations she would find that the ONLY allegation of the claimant is the failure to receive the requirements documentation prior to sending out the $1.3 million payments, i.e. a covered matter.

23

A- I did not.

85. The only "explanation" possibly offered by Federal was that the failure to obtain the required documents was considered a "secondary cause" of the loss[37].   Actually, for the reasons I set forth above, it is my opinion that the failure to obtain the required documents were, at minimum, the *primary* cause of the loss.  However, even under Federal's theory that it was a secondary cause of the loss, an allocation should *still have been made* between the two causes[38].

86. Related to this failure is Federal's second major failure with this insured, a failure to understand the business CFAS was in despite the clear description of it in the insured's application.

87. Question 2 of the application signed by the insured on June 21, 2017 asks the Insured to describe its services.  The insured's response:

> Fiduciary funds control on construction projects to mitigate risk project owners and sureties.  Each project under administration has its own bank account from which payments are made for project labor and material after evaluation of applications for payment against original contract statement of values and contract progress.  Payments are made after required lien releases are obtained.

88. Question 4 of the application states "For the most recent prior fiscal year revenue listed on line (b) of question 3, please indicate the percentage of revenue from each services described in question 2.  The Insured response:

> Construction Project Funds Administration – 100%

---

[37] See generally Deposition of Cheryl Napurano at 34:2-35:7
[38] Under Ms. Napurano's theory that the Allocation provision really only deals with allocation between covered and uncovered *allegations*, ironically she would be correct that no allocation would be needed because in such an event the only allegation, the failing to obtain the required documentation before funding, a covered matter and there is no uncovered allegation in the Claim.  This interpretation of the Allocation provision would immediately result in 100% coverage for the Claim.

89.     Despite these clear descriptions, in handling the claim Federal appeared to be confused as to what the insured actually did for a living.  Ms. Napurano's boss emailed her on April 23, 2018 and asked[39]:

> Cheryl, please investigation background.  How is transferring money part of the Insured's Services of consulting?  What exactly was the insured's role?

90.     This claims department confusion as to what the insured does for a living seemingly prevented Federal from recognizing the real cause of the loss in this claim.  If such a recognition had occurred, Federal either would have fully covered the claim (the correct decision in my view) or, at least, reviewed and attempted to apply the Allocation section of the Policy as I discuss earlier.

91.     Additionally, the following testimony indicates a failure to investigate by Federal with respect to CFAS's failure to receive the required documentation before making the payments, a covered Wrongful Act, something which would have prompted, at minimum, an analysis of the allocation section of the policy[40]:

> Q-     Did your through and complete investigation include a determination about whether or not CFAS had failed to follow its procedures in connection with this loss that is the subject of the claim?
>
> A-     You're asking did I reach a conclusion on whether or not CFAS followed its procedures?
>
> Q-     Yes.
>
> A-     I don't recall because the focus on my investigation at this point was whether or not that occurred  here or the failure to follow certain procedures had initially flowed from an unauthorized breach of somebody's e-mail system.  So, I don't remember if I reached a specific conclusion on whether or not CFAS had followed their internal procedures

---

[39] FEDERAL 000473
[40] Deposition of Cheryl Napurano at 32:14-33:6

at that point because it was specifically relevant to the coverage determination at that time.

92.     Unfortunately for the insured, Ms. Napurano's testimony as to how she viewed the failure to procure the required documents once she did make a determination that her insured committed their error was a continued violation of the even handed industry standard:

A-  At some point, I don't recall exactly when I received enough information to confirm or conclude that they did not include the documentation specified in the agreement. However, that was *secondary* to the investigation into whether or not the opportunity to make this error arose out of the unauthorized breach that I discussed before, the unauthorized access to someone's e-mail system[41]. (emphasis added)

93.     These responses, individually and certainly in the aggregate, represent a most severe violation of industry custom and practice.  Under industry standards, insurers are required to investigate all reasons on which they reserved their rights in a timely fashion and to communicate effectively to their insureds the outcome of such investigation.  They are required to investigate the claim in an even handed manner placing the interests of the insured equally with that of their own interests.

94.     Ironically, one of the best articulations of the correct approach to a claims investigation is articulated by Ms. Napurano herself early in her deposition when she is describing the approach she and Federal take when a new claim comes in[42]:

Q-     And can you describe for me what the distinctives are of the claims service Federal and you provide that makes it the best possible?

A-     When I receive a new claim, I strive to do a detailed investigation, and communicate with the insured and or their representative, keep everyone apprised of the development in both coverage and determination and investigation toward claim resolution and to do that in a way that makes our insured feel that I'm taking

---

[41] *Ibid*  at 34:6-14
[42] Deposition of Cheryl Napurano at 25:7-21

each matter seriously and treating them individually as one of the most important things that I'm doing that day so that is how I interpret our commitment to provide the best possible claim service and I attempt to get that done each day.

95.    In my view, Ms. Napurano should be commended for this answer.  It is a perfect description of how a claims department should act.  Unfortunately for the insured in this case, she did not live up to these standards.

**Federal's Cyber Exclusions**

96.    The preceding section assumed that Federal is correct that the cyber exclusions of the Policy apply to the facts of this case, i.e. they potentially result in some "uncovered matters."

97.    In my opinion, this view of the cyber exclusions of the Policy is inconsistent with industry custom and practice in what situations these exclusions should be applied. There are two reasons for my opinion.  To understand the first reason, a bit of background on the cyber insurance industry is useful.

98.    Cyber insurance was created in the US Market in 2000 by an unit of AIG as the economy began to more and more depend upon the internet as a means of commerce and communication.  I was the AIG's unit Chief Operating Officer and am especially familiar with the purpose of the cyber insurance industry.  This expertise has continued in my consulting days as a drafter of cyber insurance policies for other companies.

99.    Over the course of the years since AIG created the product, cyber incidents have grown in intensity and frequency[43]. This has had an substantial impact on both the buyers who increasingly understand the need for cyber coverage and the sellers who wish, whenever possible, to guide buyers into the purchase of standalone cyber insurance

---

[43] See e.g. https://www.industryweek.com/technology-and-iiot/cyberattacks-skyrocketed-2018-are-you-ready-2019

policies[44], especially if those policies are sold by the insurer. Today, the cyber insurance market is reaching $2 billion in premium.[45]

100.   As a matter of structure, professional liability underwriters are frequently part of the same division as are the cyber insurance underwriters for the same insurer.  This is true of Chubb who is considered a leader in both of these fields.

101.   Carriers with this organizational structure (like AIG or Chubb) are especially positioned to make sure that the evaluation of an insured's cyber risk and security is "transferred" from professional liability policies to the standalone cyber policies allowing better underwriting of the risk and, as a practical matter, a second premium flow to the insurer.

102.   The function of  the standalone cyber insurance underwriter is to evaluate an *insured's* cyber security processes and protocols to determine appropriate pricing and terms of the cyber insurance policy.

103.   To help accomplish the desired transfer described above, a professional liability insurance policy might contain a cyber risk exclusion for which the professional liability insurance underwriter will explain is in the policy because the carrier has another set of underwriters (conveniently located in the same general department) that would be happy to evaluate the insured's cyber security and offer a standalone cyber insurance policy should the insured wish one and qualify for one.

104.   Viewed in this light, the purpose and extent of the cyber insurance exclusions in the Policy become clear.  They are meant to only apply to cyber-attacks against the *insured* (presumably for which the insured can purchase a cyber-insurance policy if it wishes) and does not apply to cyber-attacks against the *insured's customers* or other third

---

[44] I note that this "guidance" has not been always strong.  For example, current property policies frequently include cyber incident coverage whether by the absence of an exclusion ("silent coverage") or as often expressed coverage for damage to data.

[45] https://www.insurancejournal.com/news/national/2019/05/15/526467.htm quoting a Fitch analysis.

parties even if those attacks might affect the insured or cause the insured, even indirectly, loss.

105.    Put another way, in light of the strong history and purpose of cyber insurance, it would be a reasonable expectation of the Insured in this case that the cyber exclusion in its E&O policy would only apply to cyber-attacks against it since it is only these types of attacks that the insured has the option to buy a standalone cyber policy whether from the same insurer or another insurer, but the exclusion does not apply to cyber-attacks against the insured's customers since this type of attack would not be normally covered by any standalone cyber policy the insured might buy.  Accordingly, the insured has a reasonable expectation that should it suffer a loss otherwise covered by its E&O policy arising out a cyber-attack against one of its customers it would be covered by the E&O policy because it would not be covered under any other policy the insured could buy[46].

106.    Indeed, Cheryl Napurano, the Federal claims examiner in charge of the claim, spoke of this connection in her April 24, 2018 telephone call with Mandy Ivey, claims contact at the insured's broker, Murray Securus.  In her notes to file Ms. Napurano "Client's claim letter alleges fraudulent wire transfers but I have not yet spoken to Insured or their attorney to confirm details.  She advises that the insured does not have cyber liability coverage.  Discussed possible application of the unauthorized network access exclusion endorsement.[47]"  In her deposition she explains why she asked the broker about cyber insurance:

> Any time I get a new claim, I also investigate what other potential areas of coverage there might be … So this one where I felt looking at the initial documentation, I suspect that there might have been an [un]authorized access somewhere, is there any other coverage that CFAS could submit this under…So that's why I asked her if they had cyber liability coverage, and it says that she advised no, they do not[48].

---

[46] I am ignoring financial loss to a company's stock price due to a cyber event since that is the subject matter of another policy the insured could purchase, namely a directors and officers insurance policy.
[47] FEDERAL  000468
[48] Deposition of Cheryl  Napurano at 92:15-93:7

107.    With the above in mind,  I viewed the actual language of the cyber exclusions and
        noted that the particular language of the cyber exclusions in this case can be misleading
        in this regard if not read in conjunction with the policy as a whole.  In particular, both
        exclusions refer to unauthorized access to, or use of, or alteration of, "*any* computer
        system" (emphasis added).

108.    However, as discussed earlier, words in an insurance contract often do not carry their
        ordinary meaning and as importantly they must be read in the context of the entire
        section where they are found and the policy as a whole.  The lead in to the exclusions
        reads "No coverage will be available under this Policy for any **Claim** against an insured
        …".  **Claims** to be subject to the Policy must allege a **Wrongful Act** of the insured.

109.    Accordingly, with respect to the cyber exclusions, it makes all the sense in the world
        for the exclusions to apply to computer systems under the control of the insured as any
        successful attack against them could, in theory, be the result of some failure on the part
        of the Insured.  However, computer systems of their customers are not in the control of
        the insured and, absent unusual circumstances not present here, any attack against them
        is not a result of a Wrongful Act on the part of the insured.

110.    For this reason, it becomes clear that the phrase "any computer system" in a cyber
        exclusion contained in an E&O policy, especially for carriers would also sell standalone
        cyber-insurance policies, once industry history and intent is taken into consideration,
        means "any computer system *of the insured*[49]."

111.    This is the first reason for my opinion that Federal would be violating industry custom
        and practice to apply the cyber exclusions in the Federal Policy to an attack against one
        of its insured's customers as is the case here.

---

[49] When confronted with this argument by counsel for the policyholder, Ms. Napurano simply advised the counsel,
according to her note to file, that the endorsement says what is says but acknowledged that she was not aware of any
case law on the issue and was "always open to considering additional information or case law if they [the insured]
would like to provide it." (FEDERAL 000416-000417).  The problem with this response is that it fails to
acknowledge that the burden is on the carrier to show that there is *no reasonable* interpretation of an exclusion
which would provide coverage, her own acknowledgement of the connection between the intent of the exclusion and
the coverage provided by a cyber-insurance policy (see paragraph 88 above) and the history of the emergence of
standalone cyber insurance.

112.    However, as I mentioned earlier, there is a second and independent reason why it is my opinion that industry custom and practice would not permit the cyber exclusion to apply in this case.  It is this second reason that I will discuss next.

113.    According to Cybersecure Solutions, there are three possible ways in which the cyber incident could have occurred which gave the cyber criminal access to Ms. Finkbeiner's email address.  The first involves unauthorized access or use of SWF's computer system ("Compromise of the coastalgrp.net system in some manner"), the second does not ("Improper configuration of the coastalgrp.net system in some manner.) and third might or might not ("Insider Threat") depending how the Insider Threat manifested itself.

114.    Ultimately, it will be up to the finder of fact to determine which scenario actually occurred or put differently whether there was in fact an authorized access or use of SWF's computer systems or whether they cyber criminals were able to send and receive emails from Ms. Finkbeiner's email address through other means.

115.    Under industry custom and practice, Federal has the burden of proving an exclusion.  Accordingly, even under Federal's broad interpretation of the exclusion, absent Federal proving that the method actually used by the cyber criminals was to gain unauthorized access or use of the SWF (or any other) computer system, Federal may not apply the exclusion[50].

---

[50] This was essentially acknowledged by Ms. Napurano when questioned by Brian Owen,  VP Claims Solutions at broker Murray Securus when he asked "Is there evidence to establish it [the fraudulent emails] was a result of unauthorized access?  If it was simply a fraudulent email from a third party, is that really unauthorized access…? (Email of June 6, 2019 from Brian Owen to Cheryl Napurano, FEDERAL 000409-000410].  Ms. Napurano's email response a few minutes later stated "If there is new information or evidence to the contrary [that the fraudulent email was not due to unauthorized access to a computer system], then I am happy to consider that as well."  While it is appropriate that Ms. Napurano is be open to changing her mind on coverage issues when new information comes forth, her response fails to fully consider that the burden is on the carrier to show that an uncovered cause must be in fact the cause of a loss when there also exists evidence that it could have been caused by a covered cause. [FEDERAL 000410] Further, in her deposition in response to a question about her denial of coverage letter, Ms. Napurano states that "it was confirmed that Coastal's e-mail system had, in fact, been hacked." (Deposition of Cheryl Napurano at 53:2-8)

**Other Exclusions**

116.     While the cyber exclusions seem to be the main exclusions that Federal is raising in this
         case, their affirmative defenses also mentions several other exclusions.  I will quickly
         address those in this part of my report.

117.     **Contract Exclusion –** Exclusion (9) is typical in D&O and E&O policies and reads
         that no coverage is available under the policy for any claim made against an Insured
         "for any liability assumed by the **Insured** under any contract..".  Of course, if the
         exclusion stopped there it would wipe out all coverage under a E&O policy for almost
         any type of claim since E&O claims always arise from a contract.  Accordingly,
         Federal's exclusion like all E&O contract policies contain an exception or "carve-out"
         that states "except to the extent that such liability would have attached to the **Insured**
         even in the absence of such contract."  This is called the "tort" exception to the contract
         exclusion and applies to give back coverage when the claim is alleging negligence or
         some other tort of the Insured.  Since the essence of the Claim against the **Insured** in
         this case, as alleged by the underlying plaintiff, is negligence in the performance of its
         professional services (i.e. disbursing funds without receiving the required proper
         documentation), this claim clearly falls within the carveout.  In other words, it is typical
         tort based E&O claim not excluded by the policy's contract exclusion.

118.     **Return of Fees –** This exclusion, written as an exception to the definition of **Loss**, says
         that covered **Loss** shall not include any "return of fees or other compensation paid to
         the **Insured**."  This is also a typical "exclusion" (sometimes found in the exclusion
         section and sometimes, as is the case here, found in the definition of loss) in an E&O
         policy.  The reason for the exclusion is that the policy is not intended to cover lost
         profits of the insured.  In other words, if the underlying claimant is merely asking for
         his money back and the insured gives the customer back his fees, this should have
         nothing to do with the insurance policy.  Plain vanilla "return of fees" cases are almost
         always plain breach of contract cases or failures to perform in its entirety (as opposed to
         a failure to *properly* perform).

This case is a negligent performance case and the underlying claimant did not ever ask for its fees back.  Federal apparently raised the issue because the insured at one point instead of re-depositing $1.3 million into the Disbursement Account, deposited $1 million and then advised the Claimant that it would deferring receipt of the fees it is owed under the contract, by not withdrawing them from the Disbursement Account, to help make up the short fall between the $1.3 million transfer and the $1 million replenishment deposit.[51] This allowed any future deposits to be used 100% for disbursement.  The insured is not including this fee waiver in its calculation of loss so no return of fees exclusion comes into play.

This is not a return of fees situation.

119.    **Business Accommodation –** Of course, there is no business accommodation exclusion in the policy.  What Federal seem to be arguing is that there was no "loss" as defined in the policy because the insured was not legally liable to pay its customer anything and that any such payment was simply made as a "business accommodation."

There are two problems with this argument.  First, the underlying claimant is clearly alleging negligence by the insured in the performance of its professional services which negligence, according to the underlying claimant,  resulted in a $1.3 million loss to the underlying claimant.  The fact that it might make good business sense to pay customers losses which resulted from your negligent conduct does not turn the payment into a "business accommodation".  It is still payments due to an alleged legal liability.

Secondly, as a technical matter, unlike other professional liability policies, Federal's insuring clause in this Policy does not contain the standard phrase compelling the carrier to only make payments for losses "for which the insured is legally liable."  The insuring clause simply states that "The Company shall pay **Loss** on behalf of the **Insureds** resulting from any **Claim** first made against such **Insureds** and reported to the Company in writing during the **Policy Period**, or any Extended Reporting Period,

---

[51] Complaint at para 46; Declaration of John Fullmer at paragraph 24.
.

for **Wrongful Acts** committed by the **Insureds** solely in the performance of or failure to perform **Insured Services** on or after the Prior Acts Date set forth in a item 7 other Declarations and before the Policy terminates." These requirements have been fulfilled in this case.

120.    **Failure to Mitigate Loss –** There is no failure to mitigate loss exclusion in the Policy either. In addition, unlike property policies, there is actually no requirement for an insured in a professional liability policy to mitigate its loss. Having said that, the documents I read clearly indicate that the Insured did try and successfully did mitigate some of its loss when it immediately contacted the Hong Kong authorities and was able to get the relatively small balance left in the cyber criminal's bank account sent to the insured. Federal is benefiting from this mitigation by $70,090.05.

## Settlement Provisions

121.    In addition to the provisions discussed above, Federal's final argument is that they have no responsibility to pay under the Policy because the Insured violated the settlement provisions of the Policy. It is to that inquiry we turn next.

122.    Section XI (C) of the Policy states:

No **Insured** shall settle or offer to settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without [Federal]'s prior written consent, which shall not be unreasonably withheld. [Federal] shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not given its prior written consent.

123.    Federal alleges that that is exactly what the Insured did here when it deposited $1 million in the Disbursement Account on or about April 13, 2018. In other words, such deposit was, according to Federal, a non-consented to settlement and an admission of liability in violation of the Insureds obligations under XI(C).

124.    Federal itself, in its June 6, 2018 coverage denial letter, characterized the $1 million deposit as a "temporary funding." In other words, was it meant as another mitigation of

loss action, exactly how Federal apparently wanted the insured to act.  (see paragraph 102 above).

125.     What the documents I have reviewed do make clear is that the insured never entered into any written settlement agreement with the underlying claimant.  There was, as far as I can see, no release of liabilities or other document usually associated with a settlement.

126.     Further, as discussed in paragraph 111 below, Mr. Fullmer in this testimony indicated that the deposits had to made quickly in order to avoid immediate harsher consequences rather than being made as a result of a negotiation between the parties.  Indeed, in his testimony Mr. Fullmer never affirmatively indicated that he intended to settle the case or put CFAS (or their insurer) into a position that they could not seek reimbursement from SWF under the theory that CFAS did not commit any wrongdoing.

127.     In like measure, in its 6/16/18 correspondence even Federal referred to the $1 million deposit as a "temporary funding".

128.     Similarly, counsel for the underlying claimant asked the insured to make such a temporary funding "until the matter is resolved."

129.     Accordingly, the bulk of the evidence that I reviewed indicate that the deposits were made as an emergency, and in theory temporary, loss mitigation measure. The reason why action needed to be taken immediately by the insured was that the Project contract called for payments to be made to subcontractors and vendors within seven days of the deposit into the Disbursement Account.  Failure to do so results in a default under the contract[52].  The seven day deadline would have lapsed had the insured not made the deposit that it did when it did it.   In addition, the professional services contract signed by the insured required it to provide written notice to the Surety of any default triggering potential additional difficulties likely, according to Mr. Fullmer, including

---

[52] See also testimony by John Fullmer that "one of two of the subcontractors were threatening to walk off the project…by that Friday (Deposition of John Fullmer at 48:22-24; 70:15-17)

the federal government cancelling the contract which then would have cost the surety bond premium[53].

130.   Accordingly, whatever else may be true, it seems clear that the $1 million deposit did in fact mitigate the insured's losses and was exactly the type of behavior Federal is arguing the Insured not only may take but must take.

131.   As to whether such mitigation of loss action by the Insured was a violation of section XI(C) responsibilities due to the manner in which the insured took it, the issue boils down to whether: (1) the insured in making the deposit admitted liability and settled or partially settled the underlying claim without Federal's consent[54] or (2) the insured simply made a temporary deposit without admitting liability in order to avoid more adverse consequences which deposit would be returned to the insured if it is ultimately found that the insured was not liable for its customer's loss.

132.   It will be ultimately up to the finder of fact to decide.  However, from the point of view of industry standards, if there is no settlement agreement, the Insured did not legally admit liability to the claimant in the underlying claim, and most importantly Federal, should it wish to do so,  would be permitted to exercise its rights under section XI (A) of the Policy to 'defend' the Claim[55], then no violation of XI(C) has occurred.

---

[53] *Ibid* at 49:1-8

[54] Even under this scenario, as discussed in the footnote below, it seems likely that Federal suffered no prejudice from the Insured's act in making this deposit. Whether prejudice is required in order for Federal to rely upon the settlement provisions of the Policy is a question of law for the Court.

[55] The likely way this would manifest itself if Chubb wanted to litigation its insured's liability to the underlying claimant is that the insured (or Chubb as subrogee following a policy payment) would commence an action against SWF to recover the $1.3 million deposits made by CFAS at which point CFAS would presumably counterclaim alleging that it had been damaged by $1.3 million due to the insured's negligence.  At that point, in theory, the claim's and counterclaim's allegations would be litigated.  Frankly, however, under the facts of this case as I read them it would be doubtful that Chubb would start this course of action as CFAS's liability seems pretty clear and under Section XI (C) of the Policy Chubb is not permitted to unreasonably withhold consent to a settlement offer. Accordingly, as a practical  matter, all that would happen is that SWF would officially ask for a written settlement agreement for the entire $1.3 million in connection with its counterclaim,  SWF would recommend agreeing to the demand and Chubb would consent to the settlement.  The situation would be different if there was evidence that CFAS did not commit any Wrongful Act in which case it would win on its claim and SWF would lose on its counterclaim but based on what I have read there is no such evidence nor would any reasonable investigation by Chubb uncover any.

**Definition of Insured Services.**

133.   As mentioned earlier, despite the clear description of the insured services in the insured's application. Federal was apparently confused about how to word the definition of "Insured Services." The definition used on the policy strikes me, based on my experience as a professional liability underwriter, as more akin to that written for a generic services provider categorized as a "miscellaneous professional liability" insured (known in the industry simply as an "MPL account"):

> Insured Services:  consulting services performed for others for a fee, including any such consulting services that are performed electronically utilizing the internet or a network of two or more computers … See Declaration Item 6 and Endorsement No. 2 Miscellaneous Consulting Firm Endorsement.

134.   As a former professional liability underwriter and currently a consultant myself, I am well aware that the phrase "consulting services" is a broad one and can encompass a broad range of services provided by any company.

135.   Accordingly, it would be incorrect to say that the Insured's services in this case as a Construction Funds Administrator would fall outside the phrase "consulting services" as that phrase is used in professional liability underwriting.

136.   The use of such a broad phrase did seem, however, to create confusion on the part of Federal underwriting and claims personnel.

137.   Federal's underwriting files frequently showed such confusion. For example, in the "Miscellaneous Professional Liability Underwriting Worksheet" for the 2017 Policy, the underwriter describes the insured's service as:

> Applicant will be consultant who provides advice and consultation to contactors in an effort to help them get or qualify for Bonding

138.    This is despite the fact that the underwriter acknowledged that she did actually receive the insured's application including the insured's answer to question 2.[56]

139.    However, it also seems that at in the prior year's underwriting analysis, the underwriter did indicate that while the Insured's services might not technically fall within Federal's standard concept of "miscellaneous" professional liability the account should be written anyway since it seemed like good premium:

> 8/16/16:  Risk qualified for an automatic renewal, but agent is pushing back on increase due to first year charge for prior acts …Insured provides fiduciary funds control for contractors and is not something we would traditionally cover…Given claims free history, would like to offer terms in line with revenue decrease.

140.    A possible reason for this somewhat confused underwriting worksheets is that in my experience a company such as CFAS would more probably be underwritten in the insurer's financial institutions (FI) professional liability department where the underwriters are more used to underwriting insureds who handle client funds.  This observation is further supported by the fact that in the underwriter's worksheet, which was an MP and not a FI worksheet, there was no "MPL Code" for what the insured services were so the underwriting simply used the "OTHER Consult" code.

141.    This claims department confusion eventually resulted in Federal reserving their rights to deny coverage under the definition of Insured Services.

142.    Indeed, even as of September 10, 2019, the date of Federal's 30(b)(6) witness testimony and over a year after their reservation of rights letter, Federal refused to provide an opinion as to whether it was taking the position that the claim fell outside the definition of "insured services"[57]:

Q-    The first one, the first paragraph [of your June 16, 2018 denial/reservations of rights letter], that deals with the definition of insured services, you say there that,

---

[56] "7/6/07- 17 Renewal Application received, no changes to services being covered. NO claims" (2017 Underwriter's Worksheet at page 3, FEDERAL 000394)
[57] Deposition of Cheryl Napurano at 59:3-17.

"If it is determined that this matter involves an alleged error in the performance of or the failure to perform services other than the insured services as defined in the policy declarations," skipping something, but then it says then, "this matter may not meet the policies insuring clause." That paragraph, is says "if it is so determined." Have you ever so determined?

A-   I did not reach that determination because the unauthorized access exclusions applied and therefore, I did not need to reach a determination on the insured issue[58].

Q-   Have you since then?

A- No[59].

143.   This is a sharp departure from industry standards. Industry custom and standard prohibit a claims examiner to refuse to conduct an investigation of a flagged possible denial reason until she finds out whether another denial reason pans out better[60].

144.   When asked whether she had reviewed the application before sending out a letter reserving Federal rights under the definition of insured services, Ms. Napurano responded that she had and that she was even "sure" she reviewed the insured's description of its services in section II, 2 of the application[61] adding that her examination of section II, 2 "wouldn't necessarily make an impact on my handling of this claim, because the coverage determination reached wasn't necessarily related to the services that were providing."[62]

145.   Frankly, his reply simply makes no logical sense. Her letter expressly reserved the right to deny coverage on the basis of the definition of insured services yet the

---

[58] Adding to the confusion, Ms. Napurano states earlier in her deposition that she believed her investigation was "complete" (Deposition of Cheryl Napurano at 31:5-6)

[59] Deposition 59:18-19); also see 95:10-14. However, it is clear that by the time of the deposition Ms. Napurano has figured out what the insured does for a living. ("CFAS is responsible for holding construction loans in escrow until a certain project reaches certain stages of completion. At which point they receive and process requests for disbursement to subcontractors and vendors." (Deposition at 95:21-96:1)

[60] Accordingly, while for the reasons I set forth earlier, Chubb has no true basis for denying the claim due to the definition of insured services, at this point, industry custom and practice standards would forbid Federal from even raising the issue as a result of their admitted failure to investigate.

[61] Deposition of Cheryl Napurano at 38:1-18

[62] Ibid at 39:18-22

claimant's sole allegation clearly arises out of the description of services provided by the insured in its application and read by her.  There is no good faith basis for this reservation.  As puzzling given the application clarity is that if Ms. Napurano wanted to reserve rights under the definition of insured services, her first move should have been to affirmatively discuss the application with Federal's underwriters in order to determine their intent when they sold the policy to the insured.  She testifies that she did not do this[63]. This is a sharp departure from industry standards.

146.   The services provided by the Insured out of which the claim arose clearly fall within the definition of Insured Services under the Policy, especially when interpreted in light of the description provided in the insured's application, which is expressly referenced in the Policy.

**Calculation of Loss**

147.   The final issues on which I have been asked to opine is the proper calculation of  loss under the Policy. This is relatively straight forward.

148.   For the reasons set forth above, 100% of the loss incurred by the Insured is covered under the policy.  The amount of damages to the claimant is $1.3 million. There is no, as far as I can see, defense costs.  The Insured through its mitigation of loss efforts was able to recover $70,090.05 ($127,007.85 gross recovery minus $56,917.82 recovery costs) yielding a net loss before policy Retention of $1,229,909.95.  There is a $5,000 retention and therefore the net loss after policy Retention is $1,224,909.97.

---

[63] *Ibid* at 38:23-25; Also see 39:1-8 where Ms. Napurano admits that she sometimes does discuss the application with the underwriters before issuing a denial or reservations of rights letter but she didn't in this claim because there were not "any facts in connection with this claim that would have typically caused [her] to reach out to the underwriters."

# VII

## CONCLUSION

149.    In conclusion, it is my expert opinion to a reasonable degree of professional certainty that under industry custom and practice for the reasons set forth above:

    a.    Federal is acting inconsistent with custom and practice in denying coverage for the Claim  due to the Policy's Cyber Exclusions.

    b.    Federal is acting inconsistent with custom and practice in denying coverage for the Claim under exclusion (A)(9), the Policy's Contract Exclusion.

    c.    Federal is acting inconsistent with custom and practice in denying partial coverage for the Claim as falling within the exception to the definition of Loss for "reimbursement for its return of fees or other compensation."

    d.    Federal is acting inconsistent with custom and practice in denying coverage for the Claim under the theory that the Insured was not legally obligated to expend the funds for which the insured is requesting coverage but rather such funds was "merely expended as a business accommodation to SWFC."

    e.    Federal is acting inconsistent with custom and practice in denying coverage for the Claim to the extent that the Insured "failed to mitigate its alleged loss."

    f.    Federal is acting inconsistent with custom and practice in denying coverage for the Claim on the basis that the Insured violated section XI(C) of the policy ("Settlement Provisions") as explained above.

    g.    Federal is acting inconsistent with custom and practice in denying coverage on the basis of section XII, Allocation, of the Policy because, in fact, under the provisions of that section 100% of the Claim would be allocated to "covered matters."

h.   The insured was acting consistent with custom and practice in the calculation of its net losses for the Claim in an amount of $1,224,909.97.

_____

Ty R. Sagalow

Appendix A- Documents Reviewed

1. Agreements

   a. Funds Administration Agreement and Exhibits

2. Affidavits, Declarations and Depositions

   a. Affidavit of John Markley Fullmer, Jr. dated April 17, 2018

   b.  Declaration of John M. Fullmer, Jr., dated October 9, 2018

   c. Deposition of John M. Fuller Jr. taken August 7, 2019

   d. Deposition of Cheryl Napurano taken September 10, 2019 (with attachments)

3. Pleadings (Coverage – Construction Finance v. Federal Insurance)

   a. Initial Disclosure of Plaintiff dated April 5, 2019 (with attachments)

   b. Plaintiff Complaint

   c. Defendant Answer and Affirmative Defenses

   d. Proposed 306(b)(6) stipulation dated September 11, 2019

4. Policy and application

   a. Chubb *ProE&O* policy issued to Construction Financial Administration Services LLC, Policy No. 8243-6189, for policy period of August 21, 2017 to August 21, 2018

   b. Chubb *ProE&O* application from Construction Financial Administration Services signed June 21, 2017

5. Underlying Claim Correspondence

   a. Letter dated April 13, 2018 from SWF to CFAS

   b. Letter dated April 17, 2018 from Giddens-Gatton (attorneys for SWF) to Michael Wilson (attorney for CFAS)

   c. Letter dated April 19, 2018 from Wilson to Giddens-Gatton

   d. Letter dated April 30, 2018 from Giddens-Gatton to Wilson

   e. Letter dated May 4, 2018 from Wilson to Giddens- Gatton

     f.   Email dated May 23, 2018 from Rick Silva to CFAS

6.   Coverage Claim Notices and Correspondence

     a.   Letter dated April 17, 2018 from Michael Wilson to Federal (Notice of Claim)

     b.   Letter dated April 24, 2018 from Federal to Michael Wilson (Acknowledgement)

     c.   Letter dated May 22, 2018 from Kaplin Stewart (attorneys for CFAS) to Federal

     d.   Email dated May 23, 2018 from Kaplin Stewart to Federal (and Federal response)

     e.   Email dated May 29, 2019 from Kaplin Stewart to Federal

     f.   Letter dated June 6, 2018 from Federal to Kaplin Steward (Coverage Denial) (sent as an attachment to an Federal email)

7.   Emails (on the theft and immediate aftermath)

     a.   Various emails between CFS and CFAS or purported (fraudulent) to be between such parties dated*:

         i.   April 6, 2018, 8:07pm

         ii.   April 9, 2018, 10:01pm

         iii.   April 9, 2018, 9:52am (including attached "invoice")

         iv.   April 9, 2018, 10:15pm

         v.   April 9, 2018, 10:01am

         vi.   April 9, 2018, 10:21pm

         vii.   April 9, 2018, 10:33pm

         viii.   April 9, 2018, 10:15am

         ix.   April 9, 2018, 10:40pm

         x.   April 9, 2018, 10:32am

         xi.   April 9, 2018, 10:21am

         xii.   April 9, 2018, 11:25pm

         xiii.   April 9, 2018, 11:27am

         xiv.   April 10, 2018 9:54pm

         xv.   April 10, 2018, 9:37am

         xvi.   April 10, 2019, 11:59pm

         xvii.   April 11, 2018, 12:02am forwarding April 10, 2018 11:58am

xviii.   April 10, 2018, 9:54am

xix.   April 11, 2018, 1:55am (including attachment)

xx.   April 11, 2018, 2:52am

xxi.   April 10, 2018, 2:08pm

xxii.   April 10, 2018, 1:55pm

xxiii.   April 11, 2018, 2:58am

xxiv.   April 10, 2018, 2:57pm

xxv.   April 10, 2018, 1:56pm

xxvi.   April 11, 2018, 10:50pm (2)

xxvii.   April 11, 2018, 10:52pm

xxviii.   April 11, 2018, 11:16pm

xxix.   April 11, 2018, 11:43pm

xxx.   April 12, 2018, 12:04am (forwarding china registry email of 11:52am)

xxxi.   April 12, 2018, 9:22am

xxxii.   April 13, 2018, 5:09pm  and 3:43pm (from First National Bank)

xxxiii.   April 13, 2018, 1:55pm (from Mike Wilson, attorney for CFAS)

xxxiv.   April 30, 2018, 8:57pm (from Hong Kong police)

* Note: As Hong Kong and North Carolina has exactly a 12 hour time zone difference, the emails
printed from Hong Kong computer (including the forwards of emails from North Carolina) exactly
flip "am" and "pm" resulting in the same email sometimes having two different time zones exactly
12 hours apart.

8.   Underwriting File

a.   June 6, 2017 Federal (conditional) Notice of non-renewal

b.   June 21, 2017 Renewal Application

c.   July 7, 2017 Quote letter

d.   2017 Renewal Underwriter Worksheet

e.   July 18, 2017 email from Federal UW (Caricato) to ARC broker denying request
for higher ($3M) limit

f.   July 18, 2017 binder

g.   July 18, 2017 email from ARC advising authority to bind with change in address

h.   July 18, 2017 binder (revised with new address)

       i.   FEDERAL 000408-000475

9. Expert Reports

     a.   Email dated April 11, 2018, 9:22pm, from EZ MICRO to John Fullmer

     b.   CyberSecure Solutions Report dated September 23, 2019

10. Other Documents

     a.   Police Incident Report dated April 11, 2018

Appendix B

## CURRICULUM VITAE

# TY R. SAGALOW

51 JFK Parkway, First Floor West, Short Hills NJ 07078• (917) 620-2174 •

tysagalow@innovationinsurancegroup.com

### SUMMARY

**CEO & Founder, Innovation Insurance Group, LLC**, a premier consulting firm to the insurance industry specializing in expert witness services focused in management and professional liability, and product development. (www.innovationinsurancegroup.com).  Former senior executive for large global insurance companies with proven track record of management success. Expertise in new product development, management/professional liability products, cyber-risk and reputational risk products. Customer Focused, Results-oriented, entrepreneurial, visionary, inventive.

### KEY POSITIONS

- CEO & Founder of insurance consulting firm specializing in new product development and expert witness services.
- Chief Insurance Officer of Lemonade Inc, a Sequoia backed "P2P" Insurance company
- Former Chief Innovation Officer of AIG, Zurich North America and Tower Group.
- Former Chief Underwriting Officer for National Union (world's largest D&O/E&O underwriter)
- Former General Counsel for National Union (world's largest D&O/E&O underwriter)
- Former Chief Operating Officer for AIG eBusiness Risk Solutions (largest US based cyber-risk insurance company)
- Licensed P&C Insurance Broker

### KEY ACHIEVEMENTS

- Over 78 expert witness engagements as of July 2019 including major insurance companies, brokers, law firms (representing both carrier and policyholder) and entrepreneurs. (Innovation Insurance Group)
- Founding member of first InsurTech insurance carrier in the United States with a post money valuation of $620 million after only 18 months of operation (Lemonade)
- Exclusive "*Ask the Expert*" senior advisor for Advisen (D&O, E&O and Cyber)
- Host of "*Innovations in Insurance with Ty Sagalow*", "*What's New in Insurance*" - World Risk and Insurance News
- No 1 "New Product Innovator of the Year " for 2011 for first time in company 180 year history (Zurich)
- Produced $1.5B+ GWP from new and enhanced; improved development time by 33% (Zurich)
- Chief designer of cyber-insurance, a $1B industry premium business in 2012 (AIG)
- Chief designer of reputational risk insurance for Zurich and AIG
- Chief designer of Y2k Insurance (AIG)
- Chief designer of Coverage C (Entity Coverage) in Directors and Officers liability insurance

> (AIG)
- Authored several published works
  - Frequent Speaker before industry forums, FOX; testified before Congress and Chaired Congressional committees

## PROFESSIONAL EXPERIENCE

**Innovation Insurance Group, LLC** *CEO & Founder* **(3/12 to Present) (4/11/-8/11)**
Founded first known consulting company designed to provide broad array of product development services to the insurance industry. In 2013, firm created a second major practice group providing expert witness services specialized in management and professional liability.  For more information, www.innovationinsurancegroup.com; a list of clients and partners in expert witness field, go to http://innovationinsurancegroup.com/our-services/expert-witness-services/

**Lemonade Insurance Company,** *Board Member* **(8/15- Present)**
**Lemonade Insurance Company,** *Chief Executive Officer* **(8/15- 7/17)**
**Lemonade, Inc,** *Chief Insurance Officer* **(8/15 – 7/17)**
Responsible for insurance operations at first "Peer-to-Peer" insurance licensed carrier.

**Tower Group,** *Chief Innovation Officer (8/11 ₋ 3/12)*
Responsible for shepherding #40 P&C company to its next evolution of organic growth thru the development of new products.

**Zurich North America,** *Chief Innovation Officer (1/09 ₋ 4/11)*
Responsible for department charged with creating or enhancing products and launching them into marketplace for U.S.
- $1.5B in premium generated from products created new or enhanced from January 2009 (over $250M in new business)
- Launched 66 products in 2010 presenting 22.7% of all current products generating 17% of all GWP in Dec 2010
- Launched 12 "national Sales campaigns" in various industry verticals with minimum annual GWP of $50M each.

**AIG,** *President, Product Development ₋ Worldwide* (2004-2009)
Responsible for department charged with creating new products for all member companies of AIG in General Insurance
- Launched new insurance product every 15 days. Both foreign and US product launches.
- Called "a unit without peer in the insurance industry"

**AIG,** *Chief Operating Officer, AIG e-Business Risk Solutions* (2000-2003)
   Found and created cyber-risk insurance, a new market niche producing $20M (Y1) climbing to $100M (Y4)

**AIG,** *Chief Underwriting Officer and General Counsel, National Union* (1988-1994) (1994-1999)
Responsible for all major underwriting decisions for largest management liability insurance carrier producing approximately $4 billion in sales annually. Responsible for managing in-house attorneys.

**AIG,** *Staff Counsel* (1983-1988) Responsible for cases under portfolio as staff litigation counsel.

## PUBLIC POLICY EXPERIENCE

*Public Policy Advocacy* (2000 -Present) Experienced in public policy, lobbying and legislative process in cyber-risk security.

## EDUCATION

**New York University Law School**, New York, NY (L.L.M, 1987)
**Georgetown University Law Center**, Washington, DC (J.D. *cum laude,* 1983)
**Long Island University**, Brookville, NY (B.A. *summa cum laude,* 1980)

## BAR and LICENSES

New York Bar (1983)
U.S. Supreme Court Bar (2003)
P&C Insurance Broker (multiple states)

## BOARDS AND CHAIRS

Chairman, Internet Security Alliance (2007-2011); Board Member, Financial Services Information, Sharing and Analysis Center (FS/ISAC) (2004-2009); Chaired various congressional committee and private sector task forces

## SELECTIVE MAJOR PUBLICATIONS

Directors and Officers Liability and Insurance Handbook, National Association of Corporate Directors, 1999; Director and Officer Liability: Indemnification and Insurance (with Josiah Hatch and John Olson), Clark Boardman Callaghan, 1990, 1994; @ Risk, The definitive guide to legal issues of insurance and reinsurance of internet, e-commerce, cyber

## APPEARANCES

Have appeared on FOX, CNBC, Bloomberg Radio, World Business Review and National Press Club. Have appeared at the White House, Departments of Treasury, Defense, Homeland Security, and Congress in addition to regular industry forums.

## ADDITIONAL INFORMATION

http://innovationinsurancegroup.com/about/ty-r-sagalow-ceo/
www.linkedin.com/in/tysagalow

### All List of Publications (2006-2016)

1. Accounting Irregularities and Financial Fraud (with Michael Young) (*Harcourt Brace & Co, 2000-2006)*

2. *The Role of Cyber Insurance in Fighting the War on Terror,* Cutter IT Journal, May 2006.

3.    Tot Ten Steps When Faced with a D&O Denial Letter (Financier Worldwide, August 2014)


## Testimony at Deposition or Trial (2013-2019)

1.    First Horizion v Certain Underwriters at Lloyds, et al (Deposition) (District Court, Tennessee, 2013)

2.    JP Morgan Chase v Indian Harbor (Deposition) (Supreme Court, State of New York, 2014)

3.    FDIC v Rafael Arrillaga-Torrens, Jr. et al [Eurobank] (Deposition) (District Court, Puerto Rico, 2014)

4.    Millennium v Darwin Insurance Company (Deposition)  (District Court, San Diego) (2014)

5.    Sandburg vs National Union  (fact witness) (Deposition) (District Court, Texas) (2014)

6.    Millennium vs. Allied World Insurance Company (Deposition) (District Court, San Diego) (2014)

7.    Millennium v Darwin Insurance Company (Trial)  (District Court, San Diego) (2015)

8.    Repid vs. Philadelphia Insurance et al (Deposition) (Circuit Court, Maryland) (2015)

9.    Imperium vs. Shelton & Associates (Deposition)(District Court, Mississippi) (2015)

10.   Beazley vs. ACE (Deposition)(District Court, New York) (2015)

11.   Illinois National Insurance vs. AlixPartners (Deposition) (Circuit Court, Michigan) (2016)

12.   Baldwin vs. Aon Risk Services (Deposition) (Superior Court, Frenso (CA) (2016)

13.   Patriarch Partners vs. Axis Insurance Company (Deposition) (District Court, NY) (2016)

14.   Fidelity and Deposit Company of Maryland (Zurich) vs First National Community Bankcorp (Deposition) (District Court, PA) (2016)

15.   Crowley Maritime Corporation vs National Union Fire Insurance Company of Pittsburgh, P.A. (Deposition) (District Court, FL) (2017)

16.   Universal Cable Productions et al vs Atlantic Specialty Insurance Company (Deposition) (District Court, CA)(2017)

17.   Intestate Fire & Casualty Company vs AXIS Surplus Insurance Company (Deposition) (Circuit Court, FL) (2017)

18.    ONYX Pharmaceuticals, Inc. vs Old Republic Insurance Co., et al (Deposition) (Superior Court, CA)(2018)

19.   Rosela et al vs. American Power Boat Association…Specialty Insurance Group, Inc., Everest National Insurance et al (Deposition) (District Court, MD) (2018)

20.   Landmark Worldwide, LLC vs. Seyfarth Shaw LLP (Deposition) (Superior Court, CA) (2018)

21.   Landmark Worldwide, LLC vs. Seyfarth Shaw LLP (Trial) (Superior Court, CA) (2018)

22.   ONYX Pharmaceuticals, Inc. vs Old Republic Insurance Co., et al (Trial) (Superior Court, CA) (2018)

23. Peavy Electronics v. NUFIC and McGriff, Seibels & Williams (deposition) (Circuit Court, Birmingham Alabama)(2018)

24. Intestate Fire & Casualty Company vs AXIS Surplus Insurance Company (Trial) (Circuit Court, FL) (2018)

25. Pretl v. AAAfordable Transportation v. Baltimore City Board of School Commissioners (deposition) (Circuit Ct, MD)(2018)

26. Scottsdale Insurance Company vs CSC Agility Platform, Inc Fka ServiceMesh (deposition) (District Court, CA)(2019)

27. Scottsdale Insurance Company vs CSC Agility Platform, Inc Fka ServiceMesh (deposition) (District Court, CA)(2019)

28. Zurich v D&T Holding (deposition)(Arbitration, IL)(2019)


## List of All Publications

1. Directors and Officers Liability, Indemnification and Insurance (with Josiah O. Hatch, III and John F. Olson) (*West Group/Clark Boardman Callaghan)* (1994)

2. Directors and Officers Liability Insurance: A Director's Guide (*National Association of Corporate  Directors, 1999)*

3. *Board Responsibilities for Managing the Risk of eBusiness*, Director's Alert, 2001

4. *@ Risk, The definitive guide to legal issues of insurance and reinsurance of internet, e-commerce and cyber perils*, Reactions Publication, 2002

5. *Cyber-Risk Management: Technical and Insurance Controls for Enterprise-Level Security* (with Carol A. Siegel and Paul Serritella), Information Security Handbook, 5th Edition, Harold F. Tipton, Auerbach Publications, 2003

6. Accounting Irregularities and Financial Fraud (with Michael Young) (*Harcourt Brace & Co, 2000-2006)*

7. *The Role of Cyber Insurance in Fighting the War on Terror,* Cutter IT Journal, May 2006.

8. Tot Ten Steps When Faced with a D&O Denial Letter (Financier Worldwide, August 2014)